UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | 09-CV-1739 |
| | ) | |
| JOHN P. MESSINA, d/b/a | ) | Judge Gettleman |
| The Law Office of John P. Messina, | ) | |
| Debtor. | ) | |
| ------------------------------------------------------- | ) | |

## MOTION FOR LEAVE TO FILE *INSTANTER*

With respectful apologies to the court and the appellees for the tardiness of these papers, debtor-appellant, John P. Messina, d/b/a The Law Office of John P. Messina, moves the court for leave to file *instanter* his opening brief on appeal (attached hereto) and the appendix thereto, and in support thereof states as follows:

1.     Debtor, appearing *pro se*, is a sole practitioner.  He has previously moved for several extensions of time. No appellee objected to any of those requests. No appellee has complained about the tardiness of his opening brief.

2.     The bankruptcy case underlying this appeal is complex—it began ten years ago as a Chapter 11 case, was converted to Chapter 7, and includes three adversary proceedings.  Nevertheless, the legal arguments in debtor's opening brief are concise—less than eight pages.

3.     The real challenge in this appeal, from a drafting point of view, has been the statement of facts, and the statement of procedural history relevant to the disputed legal issues, which include a ruling against debtor on collateral estoppel grounds. Presenting a fair, complete, and coherent statement of facts and procedural history has been a challenge because:

- The bankruptcy case grew out of four civil cases filed in the Northern District of Illinois in 1989-90 and a related, 33-count criminal case filed in 1993 in the Western District of Michigan.

- There have been three appeals to the Seventh Circuit—one by a group of journalists associated with the Medill School of Journalism and two by debtor.

- The case at the core of all three appeals was sealed without a hearing or explanation, and with the docket suppressed, so that there was no official record of the case for four years and nine months, as more than 350 records accumulated in chambers without being entered on the docket.

4.     Debtor has worked diligently, and exclusively, on this appeal for the last four weeks.

WHEREFORE, debtor-appellant prays for an order granting him leave to file his brief and appendix *instanter*.

/s/John P. Messina

The Law Office of John P. Messina
541 North Cuyler
Oak Park, IL 60302
(708) 228-4507

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | 09-CV-1739 |
| | ) | |
| JOHN P. MESSINA, d/b/a | ) | Judge Gettleman |
| The Law Office of John P. Messina, | ) | |
| Debtor. | ) | |
| -------------------------------------------------------- | ) | |

**BRIEF OF APPELLANT JOHN P. MESSINA,
d/b/a THE LAW OFFICE OF JOHN P. MESSINA**

John P. Messina, *Pro Se*
541 N. Cuyler, Oak Park, IL 60302
(708) 228-4507
Attorney No. 1892622

# TABLE OF CONTENTS

Jurisdictional Statement ..................................................................................................1
The Appelles .........................................................................................................................1
Issues Presented ..................................................................................................................1
The Standards of Appellate Review. .............................................................................1
Statement of the Case. .......................................................................................................1
Nature of the Case—the Prior Litigation. ..................................................................1
Nature of the Consumer Class Actions ........................................................................3
Nature of the Bankruptcy Case ......................................................................................3
Course of Proceedings .......................................................................................................3
STATEMENT OF FACTS ....................................................................................................6

    A.     Introduction. ...........................................................................................6

        1.     The orange juice industry. ...........................................................7
        2.     Home Juice and related entities. ...............................................8
        3.     Flavor Fresh, Peninsular, and IDEA. .......................................9
        4.     The demise of Peninsular (1991) and Flavor Fresh (1993). ......................10

    B.     The risks associated with manufacturing adulterated food products. .............10

        1.     The regulatory framework. ........................................................10
        2.     The FDA's voluntary recall program .......................................11
        3.     The public's acute sensitivity to health risks associated with food: 1959-1989. .......................................................................11
        4.     The economics underlying the FDA's amnesty policy ................13
        5.     Civil suits by competitors. ...........................................................13
        6.     Civil suits by consumers. .............................................................14

    C.     Hines, Purity Products, and the 1976-1988 civil suits in Maryland against Everfresh, Holiday Juice, and Home Juice/American Citrus. ....14

    D.     The FDA investigations, and the evidence inculpating the Labatt Judgment Creditors. ...........................................................................14

        1.     The FDA's 1976-78 investigation of Everfresh. ......................14
        2.     Hygienic adulteration by the Home Juice entities, Flavor Fresh, and Peninsular. ...................................................................15
        3.     The conflicting claims about the active ingredient in Oleum 320/IDEA. .......................................................................15
        4.     Marshall's 1992 proffer implicating the Home Juice entities, Flavor Fresh, and Peninsular in economic adulteration. ...............16
        5.     Marshall's admissions implicating Everfresh and Home Juice/American Citrus as users of Oleum 320/IDEA ................17
        6.     The February 1993 indictment of Flavor Fresh and Peninsular. ...............17
        7.     Consumers: $45 million in damages. ........................................18
        8.     The other sentences. ....................................................................18

    E.     Labatt and its orange juice subsidiaries. ....................................18

        1.     Everfresh's criminal conduct after Labatt acquired it ............19
        2.     The audit of Everfresh's and Holiday Juice's operations. .........19
        3.     The May/June 1989 amnesty meetings ....................................20

    F.     The district court's fictional alter ego. .......................................20

G.    Grove Fresh's February 1989 lawsuits.................................................21
    1.    The hiring of debtor as local counsel............................................21
    2.    Hines's discharge.............................................................................22
    3.    The hiring of Rivkin Radler & Kremer as additional counsel. ..............22
    4.    The settlement of the case against Flavor Fresh ...........................22
    5.    The 89c1113 defendants' suppression of evidence...........................22
    6.    The 89c1113 confidentiality order.....................................................23
    7.    The July 1990 challenge to claims of confidentiality ....................23
H.    The 90c5009 case...................................................................................24
    1.    The emergency motion to seal the 90c5009 complaint......................25
    2.    The procedural history of the seal order as described by the Contempt
        Order..........................................................................................26
    3.    The suppression of the 90c5009 docket...........................................27
    4.    The unsuccessful motion to dismiss the 90c5009 complaint ...............27
    5.    The 90c5009 confidentiality order....................................................28
    6.    The order compelling a 17-year period for discovery ....................28
    7.    The press's challenge to the seal. ...................................................29
    8.    The omission to rule on the claim that debtor had falsely accused the
        Labatt Judgment Creditors, and the consequences of that omission.......29
I.    The settlement negotiations, and related events. ................................30
    1.    The consumer class actions .............................................................31
    2.    The district court's role in the settlement negotiations. .................31
    3.    The district court's view that "[t]he defendants bought the case from the
        plaintiff." .....................................................................................32
J.    The Post-Settlement Proceedings. ......................................................33
    1.    Debtor's motion for a hearing .......................................................33
    2.    October 28-31: Moser's untruthful affidavit, and the *New York Times'*
        front-page story.............................................................................34
    3.    The contempt proceedings. ............................................................34
    4.    The remand of the Coalition's appeal, and the oral explanation for the
        seal..............................................................................................34
    5.    The finding regarding the attorney-client relationship between debtor and
        Grove Fresh post-January 21, 1993 .................................................35
    6.    The recusal motion and the Section 1927 motion ...........................35
    7.    The February 1995 agreed order that would have created an official
        record of 90c5009 record................................................................35
    8.    The contempt trial .........................................................................36
    9.    The partial docket created on May 16, 1995....................................36
    10.    The appeal from the denial of the §1927 motion............................36
    11.    The five-year prior restraint............................................................37
    12.    The Rule 11 sanction regarding debtor's status as a Grove Fresh attorney.
        ....................................................................................................37
    13.    The *Chicago Tribune* article and the ARDC investigation. ............37
    14.    The problems with the record on appeal........................................38
    15.    Jenner & Block's reconstruction of the record, at a cost of $40,000. ......38
    16.    Jenner & Block's undisclosed conflict of interest .........................38
    17.    The Seventh Circuit's unpublished ruling. ....................................39

      18.    The ARDC investigation ...................................................................39

K.    The injunctions barring debtor from participating in state court proceedings as either a lawyer or witness. .......................................39

    1.    The injunction barring debtor from filing a state court class action complaint...................................................................39

    2.    The proposed settlement of the state-court class actions. ..........40

    3.    The injunction barring debtor from communicating non-confidential information to consumers objecting to the proposed class action settlement ...................................................................40

L.    Statement of Facts Regarding this Bankruptcy Case. ....................41

    1.    The Labatt Judgment Creditors' Adversary Action. ...................41

    2.    Debtor's motion for a Rule 7054(b) certification........................42

    3.    Adversary Action No. 03-A-1803......................................42

M.    Note regarding debtor's FRCP 60(b) motion...................................43

SUMMARY OF ARGUMENT .......................................................................43

I.    THE COURT SHOULD ENTER SUMMARY JUDGMENT FOR DEBTOR ON THE 99-A-1573 COMPLAINT BECAUSE THE $149,554 FEE AWARD IS DISCHARGEABLE............45

    A.    As a matter of law, asking for a hearing to respond to defamatory charges is not a malicious act. .......................................................45

    B.    The bankruptcy court erred by giving preclusive effect to the Contempt Order's findings on the issue of malice and willfulness. ...................46

        1.    The structural errors underlying the contempt proceedings rendered those proceedings unfair *per se*...............................................46

        2.    Debtor was not fully represented in the contempt proceeding. ..............47

        3.    The Contempt Order's ultimate finding on willfulness rested on predicate findings that were never actually litigated, decided, or subject to appeal.47

        4.    The predicate findings underlying the Contempt Order's ultimate finding on willfulness were based on judicial intuition, not on evidence adduced at trial. ...................................................................48

        5.    The Contempt Order is not a reliable account of the underlying proceedings. ...................................................................48

    C.    This court can, and should, enter summary judgment for debtor on the complaint...................................................................49

II.    THE TRUSTEES BREACHED THEIR FIDUCIARY DUTIES, SO THEIR FEE AWARDS SHOULD BE VACATED. ...................................................................49

III.    THE BANKRUPTCY CASE SHOULD BE REMANDED FOR A HEARING ON THE MERITS OF DEBTOR'S OBJECTIONS TO THE TRUSTEE'S APPLICATIONS FOR ADMINISTRATIVE EXPENSES. ...................................................................50

CONCLUSION ...................................................................50

# TABLE OF AUTHORITIES

## Cases

*Amchem Products, Inc.* v. *Windsor, 521 U.S.* 592, 625-26 (1997) ....................................47

*Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993)..................................................................46

*Chapman v. California*, 386 U.S. 18 (1967) .........................................................................46

*Gelb v. Royal Globe Insurance Co.*, 798 F.2d 38, 45 (2d Cir. 1986) ..................................47

*Gordon v. Boden*, 224 Ill. App. 3d 195, 205-06, 586 N.E. 2d 461 (1st Dist. 1991).....................14

*Grove Fresh Distributors, Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 898-99 (7th Cir. 1994) .............34

*Grove Fresh Distributors, Inc. v. John Labatt Ltd.,* 888 F. Supp. 1427 (N.D. Ill. 1995) ...................3

*Grove Fresh Distributors, Inc. v. New England Apple Products Co.,* 969 F.2d 552 (7th Cir. 1992). ...21

*In re Estate of Callahan,* 144 Ill. 2d 32, 578 N.E.2d 985 (1991) ........................................30

*In re Oliver,* 333 U.S. 257, 270n.25 (1948)...........................................................................46

*In re Yonikus,* 996 F.2d 866, 868 (7th Cir. 1993)....................................................................1

*In the Matter of Taxman Clothing Co.,* 49 F.3d 310 (7th Cir. 1995).....................................50

*Johnson v. Gudmundsson,* 35 F.3d 1104, 1108 (7th Cir. 1994) ........................................5, 42

*Matter of Memorial Hospital of Iowa County, Inc.,* 862 F.2d 1299, 1302 (1988) ...............44

*McGuirl v. White,* 86 F.3d 1232 (D.C. 1996)........................................................................50

*Montana v. United States,* 440 U.S. 147, 164n.11 (1979).....................................................46

*Neder v. United States,* 527 U.S. 1, 8 (1999)........................................................................46

*Parklane Hosiery Co. v. Shore,* 439 U.S. 322 (1979)...........................................................24

*Press-Enterprises Co. v. Superior Court of California,* 478 U.S. l, 7 (1986) ......................46

*Reynolds v. Beneficial National Bank,* 288 F.3d 277, 283 (7th Cir. 2002) ..........................48

*Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 597 (1980) .....................................43

*Rose v. Clark,* 478 U.S. 570, 577 (1986)...............................................................................46

*United States v. Kohlbach,* 38 F.3d 832, 834 (6th Cir. 1994) ................................................7

*Waller v. Georgia,* 467 U.S. 39 (1984) .................................................................................46

*Wisconsin v. Constantineau,* 400 U.S. 433, 437 (1971)........................................................45

## Statutes

11 U.S.C. §523(a)(6) .........................................................................................................3, 41

15 U.S.C. §1117 ......................................................................................................................13

21 U.S.C. §§334(a)(1) .............................................................................................................10

21 U.S.C. §342(a)(2)(A) ..........................................................................................................10

21 U.S.C. §342(b) ....................................................................................................................10

21 U.S.C. §348 ................................................................................................................. 10, 15

21 U.S.C. §375 ........................................................................................................................43

28 U.S.C. §158(a)(1) .................................................................................................................1

## Other Authorities

Curatolo, *Pop Tarts and Elixirs of Death: An Examination of FDA's Recall Authority,* pp. 10 (2005) .................................................................................................................................11

*FDA Consumer*, vol. 29, No. 10 .............................................................................................17

Gellhorn, *Adverse Publicity by Administrative Agencies,* 86 Harv. L. Rev. 1380, 1408 (1973) .......11

Johnson, *Publicity and the FDA, an Update,* p. 13 (1997) ....................................................12

McFarland, *Insufficient FDA Resources: Leveling the Playing Field and Reducing Fraud by Altering Incentives,* p. 8 (2001) ..............................................................................................13

*New York Times* ........................................................................................................... 12, 13, 34

R. Posner, "In the Fraud Archives," *New Republic* 29 (April 19, 1999) .....................................48

Ropp, "Juice Maker Cheats Consumers of $40 million," *FDA Consumer* (Jan-Feb. 1994) .....10

SCIENCE, vol. 174, pp. 1248-50 (December 17, 1971) ...........................................................16

**Rules**

21 C.F.R. §7.3 ..........................................................................................................................11

FRCP 61 ..................................................................................................................................46

LBR 7056-1 .............................................................................................................................41

LBR 7056-2 .......................................................................................................................41, 42

Rule 5.6(b) of the Rules of Professional Conduct..................................................................30

**Treatises**

3 Blackstone, COMMENTARIES, at * 373.].............................................................................43

COLLIER ON BANKRUPTCY ¶704.02[3] (2001) ...................................................................49

RESTATEMENT (SECOND) OF JUDGMENTS §28(3) ..............................................................46

Wright, Miller & Cooper, FEDERAL PRACTICE & PROCEDURE: 2d §2716 (2009) ...................49

Wright, Miller & Cooper, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 2d §4419
    (2009) .................................................................................................................................47

**Regulations**

26 C.F.R. §146.135 ....................................................................................................................8

26 C.F.R. §146.137 ....................................................................................................................8

26 C.F.R. §146.140 ....................................................................................................................8

26 C.F.R. §146.146 ....................................................................................................................8

26 C.F.R. Sec. 172.155 ............................................................................................................15

26 C.F.R.§146.145 .....................................................................................................................8

## JURISDICTIONAL STATEMENT

This appeal is from a final order approving a Chapter 7 trustee's amended final report and notice of abandonment. (R.111.)  This court has appellate jurisdiction under 28 U.S.C. §158(a)(1), which authorizes district courts to  hear appeals "from final judgments, orders, and decrees…of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title."

## THE APPELLES

The appellees include American Citrus Products Corp. ("American Citrus") and John Labatt Ltd. ("Labatt"), sometimes referred to collectively as the "Labatt Judgment Creditors." Prior to debtor's bankruptcy, American Citrus and Labatt were defendants in *Grove Fresh Distributors, Inc. v. John Labatt, Ltd., et al.,* (the "90c5009 case"), wherein debtor represented the plaintiff.  They were the two most active creditors in the bankruptcy case.

## ISSUES PRESENTED

1.      Whether the Labatt Judgment Creditors, after accusing debtor of having falsely accused them in order to "extract a large settlement" [$2,000,000], can claim that debtor caused them a "willful and malicious injury" when he asked for a hearing to respond to their charges.

2.      Whether the original trustee and the successor trustee breached their fiduciary duties by failing, for seven years, to either prosecute debtor's claim for tortious interference with economic relations or to offer it for sale at a public auction.

3.      Whether a Chapter 7 debtor who has a non-dischargeable debt has standing to challenge a trustee's application for payment of administrative expenses.

## THE STANDARDS OF APPELLATE REVIEW.

The bankruptcy court's findings of fact are subject to review under the clearly erroneous standard. Bankruptcy Rule 8013.

The bankruptcy court's legal conclusions are subject to *de novo* review.  This court may substitute its own legal conclusions for those of the bankruptcy court. *In re Yonikus*, 996 F.2d 866, 868 (7th Cir. 1993).

## STATEMENT OF THE CASE.

### Nature of the Case—the Prior Litigation.

This bankruptcy arose out of four unfair competition cases in which debtor represented the plaintiff, a local orange juice distributor.  The defendants included orange

juice processors who sold products in 25 states and Canada.  The complaints alleged that they competed unfairly by making and selling adulterated orange juice that was falsely labeled as "100% pure." The evidence showed that they had done so for about 30 years, and that for ten of those years they had used an unsafe additive imported from Europe under false pretenses.

All four cases were settled prior to trial for $2,000,000, which represented 70% of plaintiff's lost profits.  During *in camera* sessions, the district court, over debtor's objection, engineered a settlement contract that met the Labatt Judgment Creditors' demand for a restriction on debtor's right to practice law; the demand was a condition to their settling with debtor's ailing, 78-year old client. The restriction was in the form of a sham consulting agreement that, by operation of the rules on conflicts of interest, would preclude debtor from representing others who had been harmed by the Labatt Judgment Creditors.

 Surviving the closing of the settlement was an appeal by journalists challenging the seal that the district court had imposed on one of the four cases without explanation. The Labatt Judgment Creditors opposed that appeal, claiming that the seal should be permanent because debtor had, allegedly, falsely accused them in order to "extract" an undeserved settlement. Because the court had also suppressed the docket required by FRCP 79(a), there was no official record of the case, much less of the evidence that would refute the defendants' arguments on appeal. (The docket remained suppressed for a total of four years and nine months, so there was no official record of the 350 or so pleadings, motions, briefs, and court orders that had accumulated in the file.)

Debtor was not a party to that appeal, so he moved the appellate court for a hearing, arguing that it should not publish an opinion that repeated the defamatory charges without first affording him an opportunity to respond. The Labatt Judgment Creditors opposed this motion, arguing that debtor had no standing to defend himself against their charges.  They also petitioned the district court for a contempt citation, claiming that the evidence debtor cited to rebut their charges was subject to the sealing order.

The district court granted their petition and, in addition, enjoined debtor from speaking about the orange juice litigation for a period of five years unless he first obtained the district court's prior approval, which it would give only if debtor showed a public source for his proposed speech.  Debtor submitted a proposed class action complaint that, the court found, didn't disclose information protected by the seal. Nevertheless, the court barred

debtor from filing it, or giving it to successor counsel, or testifying about its contents at a hearing on a proposed settlement of class claims.  The court also awarded the Labatt Judgment Creditors $149,554 in attorney's fees for their efforts.

The district court's rulings came in a 60-page Memorandum Opinion and Order Containing Findings of Fact and Conclusions of Law ("Contempt Order"), reported as *Grove Fresh Distributors, Inc. v. John Labatt Ltd.*, 888 F. Supp. 1427 (N.D. Ill. 1995). The Contempt Order described debtor as an "attorney who could not keep a confidence" and otherwise criticized his character and fitness to practice law.

### Nature of the Consumer Class Actions

In 1993, consumers filed class action claims based on the three Grove Fresh complaints not under seal, plus the indictment in a related criminal case.  In 1996, the district court enjoined debtor from filing a RICO conspiracy complaint in those class actions; the complaint would have alleged that the Labatt Judgment Creditors were jointly and severally liable for $45 million in damages caused by out-of-business co-conspirators. In 1998, the district court barred debtor from testifying as a witness in the hearing on the fairness of a proposed class action settlement that omitted the RICO conspiracy claim.

### Nature of the Bankruptcy Case

On September 22, 1999, debtor filed a Chapter 11 petition in the name of the Law Office of John P. Messina, a sole proprietorship.(R.63.)  Debtor's schedule of assets included a contingent claim against the Labatt Judgment Creditors for tortious interference with economic relations.  (R.64.)

**Conversion to Chapter 7:** On February 6, 2001, the bankruptcy court granted a motion by the United States Trustee to convert the case to one under Chapter 7 (R.73.). At the Chapter 7 trustee's behest, the bankruptcy court changed the name of the case to "John P. Messina, debtor." (R.76.)

### Course of Proceedings

During the Chapter 11 phase of the bankruptcy case there was one adversary proceeding—*John Labatt Ltd., et al., v. John Messina, 99-A-1573*, wherein the Labatt Judgment Creditors sought to except from discharge, under 11 U.S.C. §523(a)(6), the $149,554 award of attorney's fees they incurred for procuring the Contempt Order. (R.1.) Debtor filed an answer and also a counterclaim for tortious interference with his contractual relations with orange juice consumers. (R.4.)

As discussed below at p. 41, the court granted the Labatt Judgment Creditors summary judgment on their complaint, but it never ruled on debtor's counterclaim, precluding entry of a final, appealable judgment. Debtor moved for BR 7054(b) certification, but the court denied his motion. (R.36.)

**The $50,000 Fund, Part I:** In 1997 a certain $50,000 fund ("the $50,000 Fund") [$65,000 with accrued interest] was included as security for the supersedeas bond staying enforcement of the $149,554 award to the Labatt Judgment Creditors. Debtor lost that appeal in 1998, but the Labatt Judgment Creditors didn't collect the fund. (R.59, ¶¶2-3, 7-8.)

In January 2000, debtor scheduled the $50,000 Fund as contingent property of the estate. The Labatt Judgment Creditors objected, contending that the $50,000 Fund was in the nature of a third-party surety bond that could not be property of the estate. (R.59, ¶13.) In response, debtor reclassified the $50,000 Fund from property of the estate to property that had vested in the Labatt Judgment Creditors. (R.59, ¶14.)

**Plans of reorganization:** In January 2000 debtor filed a plan of reorganization; the Labatt Judgment Creditors objected. Over the next ten months, debtor's proposed plan went through several iterations. (Docket Nos. 51, 52, 58, 59, 61, 62, 71, 72, 127, 135, 136.) The Labatt Judgment Creditors objected to each and every iteration. (Docket Nos. 41, 66, 89, 105, 115, 116, 117, 121.)

**The $50,000 Fund, Part II:** In September 2000 debtor asked the district court to release the $50,000 Fund to his bankruptcy estate "because it is essential to [debtor's] plan of reorganization." (R.59, ¶15.) That plan proposed distributing 100% of the $50,000 Fund to the Labatt Judgment Creditors. (R.67, pp. 13-14.) The Labatt Judgment Creditors opposed the motion; in January 2001, the district court denied it. (R.59, ¶¶16-17.)

**The $50,000 Fund, Part III:** After the case was converted to Chapter 7, the Chapter 7 trustee asked the district court to release the $50,000 Fund to the bankruptcy estate. The Labatt Judgment Creditors, who had previously prevailed on a claim that the $50,000 Fund was *not* property of the estate, offered no objection. (R.59, ¶¶18-19.) The district court granted the motion in August 2001. (R.59, ¶20.) Thereafter, the trustee, instead of applying the $50,000 to reduce the $149,554 owing to the Labatt Judgment Creditors, used it to finance litigation against debtor and his wife.

**Chapter 7 adversary actions:** There were two adversary proceedings during the Chapter 7 phase (2001-2009): In *Lawrence Fisher, trustee v. Arthur Berney, et al.,* 02-A-1041, the

Chapter 7 trustee sought to require a creditor to marshal assets. (R.37.) He later amended the complaint to add claims against debtor and his wife. (R.39.) The claims against the creditor were settled in August 2003. (R.44.) The claims against debtor and his wife were settled in March 2004. (R.46.)

In *John P. Messina, debtor, v. Lawrence Fisher, trustee, et al., 03-A-1803*, debtor sought a declaratory judgment that the $50,000 Fund was property of the Labatt Judgment Creditors, and not property of the estate. (R.49.) The bankruptcy court granted summary judgment to the trustee in September 2003. (R.62.) *See* further discussion below at p. 42.

**Morgan & Bley's Applications for Attorney's fees:** By April 2004 the trustee's attorneys had made contested collections of $20,432 for which they billed the estate $173,545 in time charges—a *net loss* of ($153,123). (R.88, ¶¶17-20.) They reduced these time charges to $48,000 when they filed an application for an attorney's fees award—but that amount was still more than double the $20,432 in contested collections. (R.85.)

Debtor filed objections; among them, that the trustee failed to present a cost/benefit analysis justifying his litigation choices, as required by *In the Matter of Taxman Clothing Co.*, 49 F.3d 310 (7th Cir. 1995). (R.86, pp. 10, 12, 13.) The bankruptcy court overruled the objections without a hearing on the merits, finding that debtor lacked standing because the estate was insolvent. (R.88, ¶25.) The court granted the fee application in full. (R.87.)

**Resignation of Trustee Fisher and appointment of Trustee Leibowitz:** Mr. Fisher resigned as the Chapter 7 trustee in July 2006. (R.91.) David P. Leibowitz was appointed to replace him. (*Id.*)

**Debtor's counterclaim for tortious interference with contractual relations:** Debtor's 99-A-1573 counterclaim seeks damages of at least $1,000,000. All of the essential facts have been deemed admitted by operation of *Johnson v. Gudmundsson*, 35 F.3d 1104, 1108 (7th Cir. 1994) (R.103, p. 4.) Debtor's case-in-chief can be completed with less than two hours of direct testimony and judicial notice of certain proceedings in the Circuit Court of Cook County. (*Id.*) Debtor's estimate, unchallenged by the trustee, is that trial of the counterclaim can be completed in one day. (*Id.*, pp. 3-5.)

The initial chapter 7 trustee barred debtor from prosecuting the counterclaim, on the ground that the claim was the exclusive property of the estate. (R.99, ¶16.) The trustee showed no interest in prosecuting the case, though, so in May 2001 debtor asked the trustee to abandon the counterclaim so that debtor could prosecute it. (R.88, ¶36.) The trustee

refused, stating that he had "concluded that it would be in the best interest of creditors of this estate if I were to offer the suggested causes of action for sale at a court-administered auction." (R.88, ¶8.) Seven years passed, however, without an auction, a prosecution, or an abandonment.

**Trustee's Final Report:** The trustee filed his Final Report and Account and his Applications for Compensation on October 8, 2008. (R.93-98.) Debtor filed objections, as did David L. Lee, a creditor.  (R.99, 100, 103.)

**Debtor's objections:** The gist of debtor's objections was that the court's refusal to permit an appeal of the 99-A1573 summary judgment ruling, in combination with the trustees' seven-year failure to pursue or abandon debtor's counterclaim, had left debtor in an economic and litigation limbo. Debtor requested that the closing of the estate be deferred pending his appeal from the 99-A-1573 summary judgment.  (R.103, p. 5.)

**Disposition**:  On December 15, 2008, the bankruptcy court entered and continued debtor's objection, sustained Lee's, granted the trustee's applications for compensation, and ordered the trustee to file an amended report.  (R104-06; Tr. of Proceedings.)

On December 18, 20008, the trustee filed an Amended Final Report and Account, a Distribution Report, and a Notice of Abandonment of debtor's counterclaim—seven years after debtor first requested abandonment. On January 26, 2009, the bankruptcy court entered an order approving all of the trustee's filings and closing the case. (R.111.)

## STATEMENT OF FACTS

**A.    Introduction.**

The litigation underlying this bankruptcy case began more than 20 years ago, on February 10, 1989, when a Maryland lawyer—not debtor—filed three unfair competition suits in the Northern District of Illinois. (Debtor's introduction to the litigation is discussed below at §G-1.)  The plaintiff was Grove Fresh Distributors, Inc. ("Grove Fresh"), whose line of products included Grove Fresh-branded orange juice manufactured for it by several different tertiary processors, as defined below in §1.

Relying on chemical analyses of the defendants' retail products, Grove Fresh alleged that they made and sold adulterated juice that was falsely labeled as "100% pure." The defendants were:

- Everfresh Juice Co. ("Everfresh") [the case against Everfresh is sometimes referred to as "89c1113."].

- Flavor Fresh Foods Corp. ("Flavor Fresh").
- American Citrus, d/b/a Home Juice Co. (depending on the time frame, this defendant is referred to as "Home Juice", or "American Citrus," or "Home Juice/American Citrus").

Grove Fresh did not know it at the time, but the evidence would show that these three companies, plus a fourth—Holiday Juice Ltd. ("Holiday Juice")—used a common formula for making adulterated juice. Home Juice created that formula in 1962 and eventually shared it with the others. (§D-4 [p. 17], below.)

The evidence would also show—again, unbeknownst to Grove Fresh at the time— that for about ten of those 30 years, all four companies used an unsafe additive labeled as Oleum 320/IDEA. This additive extended the shelf life of their products from 28 to at least 49 days. (A.199, ¶9.) It also enabled the defendants to save capital costs "by eliminating the need to sanitize and upgrade their production facilities." *United States v. Kohlbach*, 38 F.3d 832, 834 (6th Cir. 1994) Because consumers are acutely sensitive to health risks associated with food, the defendants risked irreversible economic damage if their use of this unsafe additive became public knowledge. *See* §B-3, below.

Before the defendants and their cohorts are introduced in more detail, a few words about the organization of the orange juice industry are in order.

### 1.    The orange juice industry.

Orange juice is commercially processed for retail sale in either of two ways. Frozen concentrated orange juice ("FCOJ") is the retail product which, when mixed at home with three parts of water, creates a potable juice. Finished single-strength orange juice ("SSOJ," also referred to as ready-to-serve orange juice), is packaged for consumption without any further steps required of the consumer.

There are three levels of orange juice processing:

- **Primary processors** are the companies that manufacture concentrate from fresh oranges. The product they manufacture, concentrated orange juice for manufacturing ("COJM"), is generally sold in bulk quantities (tankers or 55 gallon drums).

- **Secondary processors** are companies that take varieties of COJM having differing characteristics, such as degree of sweetness, acidity, color and flavor, and blending them into a uniform product. The blended product may be called either COJM or FCOJ.

- **Tertiary processors** are companies that dilute blended COJM into a packaged product for retail sale, either as SSOJ from concentrate or FCOJ

The standards of identity for the various forms of processed orange juice—*i.e.*, the recipes that establish the criteria that must be met before a food can be labeled in a certain way—permit only four basic ingredients—oranges, orange oils, orange essence, and natural pulp (but not pulp wash). *E.g.*, 26 C.F.R. §146.135 (frozen orange juice); 26 C.F.R. §146.137 (frozen orange juice); 26 C.F.R. §146.140 (orange juice from concentrate); 26 C.F.R. §146.146 (FCOJ).

Within strict limits, sugar may be added, but if it is, it must be declared on the label. *E.g.*, 26 C.F.R. §146.145(d).  Safe preservatives may be added at the primary or secondary processing stages (26 C.F.R. §§146.152-154), but not at the tertiary stage, *see, e.g.* 26 C.F.R.§146.145.

### 2.    Home Juice and related entities.

Home Juice was a **tertiary processor** founded in the 1950s by Leonard Haddad. (A. 80.) During the 1950s, 1960s, and 1970s Haddad organized numerous Home Juice franchises and affiliates throughout the United States, Canada, and Europe.  (*Id.*) Haddad died in 1978.

American Citrus was formed in 1982 by Henry Lang, Haddad's son-in-law, for the purpose of acquiring Home Juice from Haddad's estate.  American Citrus acquired Home Juice that same year.  In 1986, Home Juice was merged into American Citrus, but American Citrus conducted its business under the name of Home Juice Co.  (A. 64, ¶17&n.1.)

Everfresh was a **tertiary processor** established in the 1950s as a Home Juice franchise.  The shareholders included Haddad, Albert Allen, and, in 1969, Gerald Wolberg. In 1972, Everfresh became a wholly-owned subsidiary of Home Juice, as Allen and Wolberg exchanged their shares in the franchise for shares in Home Juice. Allen moved to Chicago and became Home Juice's president and chief executive officer. Haddad became chairman of the Home Juice board. (A. 80-81.)

Everfresh hired Daniel Kotwicki as Everfresh's controller. In 1975 Kotwicki was promoted to the Chicago headquarters and became Home Juice's chief financial officer.  (A. 81-82.)

Holiday Juice, also a **tertiary processor,** was a locally-owned Home Juice franchise in Windsor, Ontario. In 1977, after Holiday Juice encountered financial problems, Haddad and Allen purchased a controlling interest in it. They assigned Kotwicki to the Windsor operations to try and revive Holiday Juice's business.  (A. 82.)

The split between Haddad and Allen: In April 1978, Haddad and Allen decided to go their separate ways. Everfresh was spun off into an independent corporation wholly-owned by Allen. In exchange for complete control of Everfresh and certain other assets, Allen conveyed his interest in Home Juice and Holiday Juice to Haddad. (A. 82.)

In December 1978 Haddad died. In May 1979, Holiday Juice's management, led by Kotwicki, purchased Haddad's controlling interest in the company from his estate. (A. 82..)

Labatt acquired Holiday Juice in 1983 and Everfresh in 1986. (A. 82.) See §E, below.

### 3.      Flavor Fresh, Peninsular, and IDEA.

Three other firms are relevant to this narrative— Flavor Fresh; Peninsular Products Corp. ("Peninsular"); and Inter Development and Engineering Ltd. ("IDEA").

From 1979 to 1993, Flavor Fresh was owned and operated by two former Home Juice employees—James Marshall, a food chemist, and James Benton, a salesman. Before founding Flavor Fresh, Marshall was, from 1962 to 1974, vice president for research and development at Home Juice. From 1969 to 1979 or so, he was also a shareholder in Home Juice International, a Swiss firm whose other shareholders included Haddad and IDEA. (A. 83.)

Flavor Fresh was a **secondary processor** based in Chicago. (A. 180-81.)  Flavor Fresh also distributed single-serve orange juice that was packed for it by tertiary processors, including Holiday Juice, Everfresh, and Peninsular.  (A. 147, 188.)

Peninsular was a **tertiary processor** based in Lansing, Michigan.  Peninsular "manufactured orange juice out of adulterated concentrates that Flavor Fresh supplied." (A. 197, ¶4.)

IDEA was a Swiss corporation controlled by Dr. Fred Kohlbach, a German citizen. From 1979 to about 1988 or so, Kohlbach and IDEA supplied Oleum 320/IDEA to Home Juice/American Citrus, Everfresh, and Holiday Juice. (A. 44, ¶4; A. 91, 94.)  Kohlbach and IDEA also supplied Flavor Fresh and Peninsular with Oleum 320/IDEA from about 1982 to 1991. (A. 172-73, 197-99.)

Kohlbach told his customers that Oleum 320/IDEA had "one bullet for every bug" and was "undetectable." (A. 198, ¶7; A. 172, ¶6.) When he exported his product, he made a "a false declaration" on import documents that Oleum 320/IDEA was "a cleansing and aseptisizing compound" so as "to conceal from United States authorities the true identity and nature of his product." (A. 173, ¶9.)

9

#### 4.    The demise of Peninsular (1991) and Flavor Fresh (1993).

In February 1991 the FDA discovered serendipitously that Peninsular was adding pulp wash to a batch of chilled orange juice, which tertiary processors aren't permitted to do. This discovery triggered a search warrant.  The search turned up evidence that Peninsular was also adding Oleum 320/IDEA to its chilled juice. Ropp, "Juice Maker Cheats Consumers of $40 million," *FDA Consumer* (Jan-Feb. 1994).

The Michigan Department of Agriculture seized all of the orange juice processed at Peninsular on the date of the inspection.  Then, Peninsular agreed to recall its juice products still on the market. About 94,400 pounds of the products were destroyed by the firm under supervision by the Michigan Department of Agriculture.  (*Id.*) The FDA published a notice of the recall in its weekly enforcement report.  Shortly after the recall was initiated, Peninsular went out of business. (*Id.*) Peninsular and Flavor Fresh were indicted in 1993. *See* §D-6 (p. 17), below. That same year, Flavor Fresh was dissolved and its assets liquidated.

#### B.    The risks associated with manufacturing adulterated food products.

**Economic adulteration** is the practice of using inferior, cheaper ingredients to cheat consumers and undercut the competition.  Economic adulteration violates Section 402(b) of the Food, Drug, and Cosmetic Act, 21 U.S.C. §342(b).  **Hygienic adulteration** is the presence in food of a substance that has not been approved for use in food in accordance with the procedures prescribed by 21 U.S.C. §348.  Hygienic adulteration violates 21 U.S.C. §342(a)(2)(A).

Food manufacturers who make and sell adulterated food products assume the risk of criminal charges, civil remedies, and the verdict of the marketplace.

#### 1.    The regulatory framework.

The statutory penalties and remedies for adulterated or misbranded food include: (a) a seizure proceeding against the offending articles; (b) an injunction to restrain violations of the Act; (c) felony charges against the corporate officials or employees who participated in the illegal practices, punishable by up to three years in prison and fines of $10,000 for each offense; (d) misdemeanor charges against officers or employees who may not have participated in the criminal practices, but who were in a position to prevent or remedy the practices and failed to do so, punishable by up to one year in prison and fines up to $1,000 for each offense. 21 U.S.C. §§334(a)(1), 332, 333(a)(1)-(2).

The FDA may also disseminate information about violations of the Act, either before or after a hearing on the merits of the alleged violation. 21 U.S.C. §375.

### 2.    The FDA's voluntary recall program

Protecting consumers from dangerous or mislabeled food requires that the FDA be able to swiftly remove defective products from the market. The statutory procedures for product removal—seizures and injunctions—require a due process hearing and court approval, so they can be costly and time-consuming.

After the so-called cranberry scare of 1959, discussed below in §3 (p. 12), the FDA developed a voluntary recall program that has since been codified at 21 C.F.R. §7.3.  This regulation defines a recall as "a firm's removal or correction of a marketed product that the FDA considers to be in violation of the laws it administers and against which the agency would initiate legal action, *e.g.*, seizure."  21 C.F.R. §7.3(g).

The FDA has no general authority to *order* a recall of adulterated or misbranded foods, even if it has reason to believe that a firm's product presents an "imminent danger to health or gross deception of the consumer." Curatolo, *Pop Tarts and Elixirs of Death: An Examination of FDA's Recall Authority,* pp. 10 (2005) ["*Curatolo*"].[1]  However, if a firm refuses an agency request to recall a dangerous or deceptive product, the FDA could then exercise its power under 21 U.S.C. §375 to disseminate information about the product that "in the opinion of the Secretary, [involve] imminent danger to health, or gross deception of the consumer."

Ever since the cranberry scare, "the mere threat of a public announcement [has] functioned to help enforce a voluntary recall procedure." Gellhorn, *Adverse Publicity by Administrative Agencies*, 86 Harv. L. Rev. 1380, 1408 (1973) ["*Gellhorn*"].

### 3.    The public's acute sensitivity to health risks associated with food:  1959-1989.

Shortly before the 1959 Thanksgiving holiday, the Secretary of Health, Education and Welfare advised consumers not to purchase cranberries grown in Oregon or Washington, saying that they might be contaminated with a weed killer that had been found to cause cancer in laboratory rats.  The Secretary had no information that cranberries from

---

[1] Curatolo's paper is published on line in Peter Barton Hutt, ed., FOOD AND DRUG LAW: AN ELECTRONIC BOOK OF STUDENT PAPERS ("HUTT'S ELECTRONIC BOOK"), http://leda.law.harvard.edu/leda/data/729/Curatolo05.html.

other states were contaminated. Nevertheless, the Secretary told a reporter that he would not be eating cranberries that Thanksgiving. *Gellhorn* at 1408.

The nation followed the Secretary's lead, with economic consequences that devastated cranberry growers everywhere, not just those in Oregon and Washington. Virtually the entire holiday crop of cranberries, valued at $21.5 million ($154.6 million in 2008 dollars) went unsold. *Gellhoorn* at 1408-09n.116. The 1959 cranberry scare is an early example of the public's acute sensitivity to health risks associated with food, and the immediate, and often irreversible, economic effects that ensue.[2]

During the years that the defendants sold their adulterated products, there were at least four more examples of the public's sensitivity to health risks associated with food. In one case, the firm (Campbell Soup Co.) avoided permanent damage by swiftly accepting responsibility and offering to make consumers whole through a costly refund program.[3]

In the other three cases, the public's sensitivity to the health risk led to irreversible economic damage. Two of the cases involved defective manufacturing practices.[4] The third case involved intentional use of an approved chemical product (daminozide, sold as Alar) that was sprayed on certain eating apples to ensure that the fruit ripened uniformly, and also to extend the fruit's shelf life and fresh appearance.[5]

---

[2] Various explanations have been offered for this sensitivity. *See Gellhorn* at 1417-18; Johnson, *Publicity and the FDA, an Update*, p. 13 (1997), available on line in HUTT'S ELECTRONIC BOOK at http://leda.law.harvard.edu/leda/data/183/sjohnson.html.

[3] In 1971 Campbell Soup Co. discovered botulin in a test can of chicken-vegetable soup. The company notified the FDA, recalled 4,799 cans of soup, and offered refunds to all purchasers. The refunds cost Campbell $10 million in gross receipts ($52.6 million in 2008 dollars) and $5 million in net profits ($26.3 million in 2008 dollars). (*New York Times* 11/20/71, p. 41.) However, Campbell did not suffer any long-term adverse effects. *Gellhorn*, 86 Harv. L. Rev. at 1414.

[4] In 1966 Borden Co. recalled Starlac powdered milk contaminated by salmonella. "The negative publicity…kill[ed] the Starlac brand-name. The entire powdered milk industry, which had thrived due to the low cost and nonfat nutrition of the milk, was never the same." *Curatolo*, pp. 24-25. In 1971 Bon Vivant recalled vichyssoise soup contaminated by botulin. The publicity surrounding this incident "destroyed public confidence in the company and its trademark." *Gellhorn*, 86 Harv. L. Rev. at 1413. Bon Vivant filed for bankruptcy shortly after the recall was announced.

[5] As of 1989, Alar was sprayed on a minuscule segment of the apple supply—about 5%. Nevertheless, after a February 1989 report on *Sixty Minutes* that highlighted a link between Alar and cancer in children, the entire apple market collapsed. School boards in New York, Atlanta, San Francisco, and Chicago stopped distributing apples altogether. Apple growers in Washington, who at the time produced 60% of the nation's apple crop, lost at least $125 million ($214.4 million in 2008 dollars) in the six months after the *60 Minutes* report. "Health Official Rebukes Schools Over Apple Bans," *New York Times* (3/16/89).

#### 4.     The economics underlying the FDA's amnesty policy

The FDA has a mandate to "ensure the accuracy and safety of approximately 25% of all consumer products in the market." McFarland, *Insufficient FDA Resources: Leveling the Playing Field and Reducing Fraud by Altering Incentives*, p. 8 (2001).[6] Since the days of the Carter Administration, however, there has been an ever-widening gap between the FDA's responsibilities and the resources available to the agency. Hilts, *Ailing Agency—The FDA and Safety; A Guardian of U.S. Health is Buckling Under Stress*, New York Times (12/4/89).

Scarce resources have impaired the FDA's most important enforcement tools—the laboratories and equipment the agency uses to assess the safety of food, drugs, and medical devices. During the 1980s the FDA's laboratories deteriorated to the point that they were "abysmal—overcrowded, poorly maintained, hazardous and inefficient. Much of their scientific equipment is obsolete and technologically inadequate." Pear, "Panel Calls Federal Drug Agency Unable to Cope with Rising Tasks," *New York Times* (4/11/91).

The disparity between the FDA's mandate and its resources has forced the agency to prioritize its enforcement objectives. The agency's high priorities are "health hazards, filth, and nutrition;" food economics are the agency's "lowest priorities." *McFarland*, p. 9. A long-standing expression of these priorities is the FDA's amnesty policy, which exempts from criminal investigation any corporation that voluntarily cures and reports illegal practices—unless the practices were health-endangering. (A. 45, ¶8.)

#### 5.     Civil suits by competitors.

Under the Lanham Act, if an orange juice company proves that a competitor's products are misbranded, the plaintiff has two alternative measures of damages: its lost profits, or the profits that the defendant-competitor realized from selling its misbranded goods. 15 U.S.C. §1117.

A plaintiff who proves misbranding and elects to recover the defendant-competitor's ill-gotten gains has a simple burden of proof: it need only prove the gross sales of the misbranded products. The burden of proof then shifts to the defendant to come forward with evidence of its manufacturing costs. (*Id.*) The plaintiff is entitled to recover the difference between the defendant's gross sales and its costs. (*Id.*) This disgorgement remedy

---

[6] McFarland's paper is available on line in HUTT'S ELECTRONIC BOOK at
http://leda.law.harvard.edu/leda/data/372/McFarland.pdf.

makes the identity and cost of the ingredients in adulterated orange juice—such as Oleum 320/IDEA—an essential subject for discovery.

###### 6.    Civil suits by consumers.

Consumers who are defrauded into buying adulterated orange juice can recover damages under a fluid recovery mechanism, which is a format where the damages incurred by the class as a whole are determined in a single adjudication, creating a common damage fund. *Gordon v. Boden*, 224 Ill. App. 3d 195, 205-06, 586 N.E. 2d 461 (1st Dist. 1991).

### C.    Hines, Purity Products, and the 1976-1988 civil suits in Maryland against Everfresh, Holiday Juice, and Home Juice/American Citrus.

Grove Fresh's original lawyer was Jeffrey Hines, a Maryland lawyer who previously represented Purity Products, Inc. ("Purity"), a Maryland orange juice distributor. Between 1976 and 1988 Purity, represented by Hines, filed five unfair competition suits—one against Home Juice and its Everfresh subsidiary (1976), two against Everfresh only (1982 and 1986), one against Holiday Juice (1988) and one against American Citrus (1988). Each suit alleged that the defendant(s) competed unfairly by making and selling adulterated orange juice falsely labeled as "100% pure." All five cases were settled before trial. (A. 145-46.)

American Citrus settled the 1988 case against it for $150,000; the settlement contract included a covenant wherein Hines agreed that he would not represent persons who had claims against Home Juice/American Citrus arising out of acts or omissions prior to July 1988. (A.146.)

Holiday Juice settled the 1988 case against it for $250,000. The settlement included a covenant wherein Hines agreed that he would not represent persons who had claims against Holiday Juice arising out of acts or omissions prior to August 1988. (A. 146.) The covenant also protected Labatt, which had acquired Holiday Juice in 1983, and Everfresh, which had become an affiliate when Labatt acquired it in 1986. (A. 82, 146.)

### D.    The FDA investigations, and the evidence inculpating the Labatt Judgment Creditors.

###### 1.    The FDA's 1976-78 investigation of Everfresh.

In 1976, when Everfresh was still a Home Juice subsidiary, the FDA district office in Baltimore investigated the firm and several of its officers, including Bruno Moser—about whom more, later. *See* §§E-1, J-2 (pp. 19, 34), below. The investigation concerned

Everfresh's "flagrant and continuing" disregard of the laws and regulations governing the use of preservatives in orange juice. (A. 8.)

The FDA referred the case to the Justice Department, arguing that a criminal prosecution was the remedy of choice because a civil action would not accomplish a significant seizure of misbranded juice, and an injunction "would be very difficult and costly to monitor." Criminal prosecution would "serve as a deterrent to [Everfresh] and also to the industry at large."(A. 88-89.)

The Justice Department declined to prosecute, however. In the Department's view, Everfresh's crime was purely an economic one, since the preservatives in question (sorbate and sodium benzoate) did not present any danger to the public health or safety. (A. 89.)

The FDA then asked the Michigan Department of Agriculture to take enforcement action, which it did, in 1977. Everfresh resolved the state's action by agreeing to discontinue its use of preservatives. (*Id.*)

## 2. Hygienic adulteration by the Home Juice entities, Flavor Fresh, and Peninsular.

Shortly before the FDA closed its investigation of Everfresh, Home Juice spun off that subsidiary to Allen, who became its sole shareholder. (A. 82, 89.) In about August 1979 Allen and his firm began importing Oleum 320/IDEA and using it to extend shelf life. Everfresh used Oleum 320/IDEA from August 1979 through at least October 1988. (A. 89.)

## 3. The conflicting claims about the active ingredient in Oleum 320/IDEA.

The identity of the active ingredient in Oleum 320/IDEA was disputed. Some claimed that it was natamycin, an antibiotic that the FDA first approved in 1982 for application "to the surface of cuts and slices of cheese to inhibit mold spoilage." 26 C.F.R. Sec. 172.155 (1991). Others alleged that it was diethyl pyrocarbonate ("DEPC"), a sterilant that the FDA banned in 1972 as a carcinogen.

Whatever the active ingredient may have been, Oleum 320/IDEA was an unsafe additive as a matter of law because it was not approved for use in orange juice in accordance with the procedures prescribed by Section 409 of the Act, 21 U.S.C. §348(b).

The claim that the active ingredient was natamycin: Oleum 320/IDEA was imported through V.G. Nahrgang Co. ("Nahrgang"), an import agent at the Port of Detroit. (A. 89.) Kohlbach represented to Nahrgang that Oleum 320/IDEA "is composed of [a] NATAMYACIN compound with food-grade stabilizers and high oxidants in water

15

suspension." (A. 89-90.) He also stated that the product was currently being used as a "cleansing and aseptisizing compound during C.I.P (cleaning in place) procedures in juice plant operations." Relying on these representations, Nahrgang declared to customs that Oleum 320/IDEA was a pesticide. (A. 90.)[7]

However, in a 1989 audit of the Everfresh operations, Labatt's chief scientist concluded that Oleum 320/IDEA was something other than natamyacin, a pesticide, or a cleaning compound. (A.90.)

The claim that the active ingredient was DEPC: In 1982 and 1983, state and federal agencies received anonymous complaints that several juice processors in the Midwest were using DEPC. The alleged users included Everfresh, Home Juice, and Holiday Juice. (A.91.) The complaints alleged that Everfresh's DEPC "is imported from overseas, and is brought into this country as a cleaning agent." The complaints also alleged that "[a] doctor Kohlbach is the supplier of this product."(A.91.)

In the 1989 audit of Everfresh's operations, an employee told Labatt's chief scientist that he understood that Oleum 320/IDEA was DEPC. (A.94.)

The FDA's incompetent investigation: In response to the 1982-83 letters, the FDA's Detroit District Office collected retail samples of Everfresh orange juice and grapefruit juice. However, the FDA's Detroit laboratory did not perform any tests on these samples, not even for urethane, the carcinogen that is formed after DEPC decomposes. (A. 91.)

The FDA believed that there was no method for detecting the presence of urethane in orange juice. (A.91.) In fact, DEPC had been banned in 1972 because scientists could detect measurable levels of urethane in orange juice that had been processed with DEPC. The procedure for such measurements was described in 1971, 12 years before the complaints to the FDA. (A.91.) *See* SCIENCE, vol. 174, pp. 1248-50 (December 17, 1971).

4.    **Marshall's 1992 proffer implicating the Home Juice entities, Flavor Fresh, and Peninsular in economic adulteration.**

In December 1992 James Marshall—a Flavor Fresh principal and formerly Home Juice's vice president for research and development—met with federal prosecutors for 15 hours of interviews. (A.178.) During these interviews Marshall implicated Home

---

[7] If the exporter had truthfully declared that Oleum 320/IDEA was a food additive, the product would have come under FDA jurisdiction; it would not have been admitted into the United State unless the exporter first proved in a procedure under 21 U.S.C. §348(b) that it was a safe additive. Declaring that Oleum 320/IDEA was a pesticide brought the product under the purview of the Environmental Protection Agency, which would not require such proof.

Juice/American Citrus, Everfresh, Holiday Juice, Flavor Fresh, and Peninsular in a common scheme to make and sell adulterated orange juice according to a formula that he created. Specifically, Marshall admitted to prosecutors that:

- He "developed the formula for adulteration at Home Juice," and he gave the formula to Albert Allen, his contact at Everfresh. (A.179.)

- He was Holiday Juice's primary source of "information on how to adulterate." (A.179.)

- Holiday Juice, then known as JZ Juice and a "branch" of Everfresh, also obtained information on adulteration from "the Allens." (A.179.)

- When Marshall left Home Juice to form the business that became Flavor Fresh, he used "the same formula as [he] was using at Home Juice" to make adulterated orange juice. (A.180.)

- He also used the Home Juice formula when he blended concentrate for Peninsular. (A.188.)

In all, Marshall identified four Home Juice/American Citrus employees, three Holiday Juice employees, three Everfresh employees, and four Peninsular employees with whom he "talked about adulteration and formulations." (A.179, 188-89.)

### 5.    Marshall's admissions implicating Everfresh and Home Juice/American Citrus as users of Oleum 320/IDEA

In an affidavit dated October 13, 1993, Marshall testified: "I also knew through my business and personal relationships with individuals at Home Juice in Melrose Park and Everfresh in Michigan…that Kohlbach's preservative was illegally used in their 100% orange juice." (A.173.)

### 6.    The February 1993 indictment of Flavor Fresh and Peninsular.

On February 18, 1993, a federal grand jury in Michigan issued a 33-count indictment charging Flavor Fresh, Peninsular, Marshall, Benton, Kohlbach, and six others with a scheme to sell consumers adulterated orange juice. *United States v. Peninsular Products Co., et al.*, 93 CR 21 (W.D. Mich.). (The charges against Peninsular were later dropped because the company went out of business.)  *FDA Consumer*, vol. 29, No. 10 (December 1995)

The indictment accused the defendants of using large amounts of low-cost inferior ingredients like sugar, citric acid and amino acids and falsely labeling the product as orange juice from concentrate. (*Id.*)  The indictment also alleged a scheme to extend shelf life using Oleum 320/IDEA.  The indictment covered juices that were distributed under at least 23 different labels in at least 25 states. (*Id.*)

Everfresh, Holiday Juice, and Home Juice/American Citrus were not indicted even though the government had evidence that they, too, had adulterated their products. The government did, however, place some of that evidence in the public record. (A. 173, 179, 180, 196-97, 201-02.)

### 7.    Consumers:  $45 million in damages

The first sentencing hearing took place on July 9, 1993, in the case against Don Wagoner, Peninsular's chief executive officer.

Federal sentencing guidelines required the government to prove the amount of damages suffered by consumers who had purchased misbranded orange juice products made by Flavor Fresh and its co-packer, Peninsular.  38 F.3d at 835. After hearing the evidence, the court ruled that the harm to consumers was the difference between what they paid for the adulterated products and what those products were truly worth; that difference, the court found, was $45,000,000.  (R. 9, Attachment 1, Ex. F, pp. 204-16.)  Based on these findings, the court sentenced Wagoner to five years in prison.

### 8.    The other sentences

Marshall eventually pleaded guilty to two counts, including conspiracy to violate the food purity laws; he was sentenced several months after Wagoner, before a different judge. At his sentencing the government offered a more conservative measure of damages— $10,500,000. Marshall was sentenced to 37 months in prison and fined $125,000. His partner, James Benton, pleaded guilty to one count and was sentenced to 30 months in prison and fined $25,000.[8] Flavor Fresh pleaded guilty to 32 counts and was fined $320,000. Marshall appealed; his sentence was affirmed.  *United States v. Kohlbach*, 38 F.3d 832, 839-42 (6th Cir. 1994).

### E.    Labatt and its orange juice subsidiaries.

Labatt entered the orange juice business in 1983, when it acquired Holiday Juice from Kotwicki and the other owner-managers; Kotwicki continued as president. (A.82.) In December 1986 Labatt acquired Everfresh from the Allen brothers.  Michael Allen continued as president. (A.66, ¶¶25-26.)  During the negotiations with Labatt, the Allens disclosed the complaint by Purity Products alleging that Everfresh made and sold adulterated orange juice; Labatt bought the firm anyway. (*Id.*)

---

[8] The dispositions of the charges against the other individual defendants is reported at http://www.fda.gov/fdac/summarys/095_sjs.html

About eight months after the closing, Labatt settled the adulteration claims for about $70,000. (A.146.) Five months later Purity Products sued Holiday Juice. As discussed earlier, that case was settled in August 1988 for $250,000 and a covenant restricting attorney Hines's right to sue Holiday Juice, Everfresh, and Labatt. (*Id.*)

### 1.    Everfresh's criminal conduct after Labatt acquired it

**Economic adulteration:** From December 1986 through July 1987—that is, while the Purity Products' lawsuit charging Everfresh with adulteration was still pending— Everfresh made more than one million gallons of adulterated orange juice products. (A.66, ¶26.) In July 1987 Allen was replaced by Kotwicki.  Over the next five months, Everfresh made more than two million gallons of adulterated orange juice products. (210-11, ¶¶29-31.)

**Hygienic adulteration:** Bruno Moser supervised Everfresh's purchase and use of Oleum 320/IDEA. In 1986 and 1987, Moser supervised at least six purchases of Oleum 320/IDEA for which Everfresh paid in excess of $250,000. (A.65, ¶23.)

### 2.    The audit of Everfresh's and Holiday Juice's operations.

In January 1989 Duane Bosch, an ex-Everfresh employee, sued Everfresh for wrongful discharge, alleging he had been fired in retaliation for his having questioned the legality of certain practices, including Everfresh's use of Oleum 320/IDEA. (A.91-93.) Bosch's suit caused Labatt to hire McDermott Will & Emery, which then supervised an internal audit of the operations at Everfresh and Holiday Juice. (A.94.)
The audit was conducted by David Murray, Labatt's Director of Technical Services, under the direction of a McDermott, Will & Emery partner. The audit took place in February 1989. (A.94.) The auditors (and the lawyers) learned the following facts (A.94):

- The Everfresh plant in Michigan and the Holiday Juice plant in Windsor had been adding Oleum 320/IDEA to orange juice.

- Everfresh and Holiday Juice imported Oleum 320/IDEA from Europe and cleared it through U.S. Customs by declaring that it was a pesticide and cleaning-in-place compound.

- Contrary to the declarations in the papers submitted to U.S. Customs, Oleum 320/IDEA was neither a pesticide nor a cleaning-in-place compound.

- An employee at the Holiday Juice plant understood that Oleum 320/IDEA was actually DEPC.

### 3.    The May/June 1989 amnesty meetings

Labatt completed this audit in late February.  In early May, Labatt's lawyers at McDermott Will & Emery arranged for amnesty meetings with FDA officials. At these meetings, which took place on May 5 and June 21, 1989, Labatt told the FDA that it had not known about Everfresh's illegal practices until early 1989; that Kotwicki was the person who had introduced the illegal practices at Everfresh; and that Kotwicki had concealed the illegal practices from Labatt. (A.45-46, 95.)

Labatt did not tell the FDA about Allen's 1986 disclosures or about Everfresh's 10-year history of using Oleum 320/IDEA to extend shelf life. (A.95.)

### F.    The district court's fictional alter ego.

Before turning to the Grove Fresh litigation, a few words should be said about the fictional Judge Paul Devine,[9] an "honest and fair judge"[10] who sits on the United States District Court for the Northern District of Illinois. Devine is the protagonist in MONEY TO BURN (Putnam 2002), which the 90c5009 district court wrote so as to "describe and explain American judges in a way that a … judge is especially equipped to do." *Chicago Daily Law Bulletin*, p. 24 (7/9/02).

According to one critic, the novel's descriptions of how Devine handles his docket let "us in on the many ways a federal judge can change and even subvert the course of justice from a sitting position.  Some of it is…frankly a little scary."  (*Chicago Tribune* 7/14/02) [emphasis added].

When Devine takes his oath of office, he marvels at the "extraordinary power over the lives of human beings" that he will soon have. (MONEY TO BURN 181.) He notes that there are no real constraints on how he might exercise this power:

> [S]ince I have a job for life, I can do the job exactly as I see fit because, short of conviction after trial before the United States Senate on charges of impeachment by the House of Representatives, no one can fire me.

(*Id*.; emphasis added).

MONEY TO BURN creates a fictional docket of 29 civil and criminal cases that Devine adjudicates over the course of the novel. In most of these cases Devine allows the adversary system to operate as it should—he lets the parties initiate and control the definition of the

---

[9] The judge's surname is from an Old French root word meaning god-like, a playful allusion to the common complaint that some federal judges think they are God.

[10] *CNN.com Transcripts*, "When Politicians Go to Prison," p. 2 (aired July 31, 2002).

issues and the presentation of evidence, while he remains passive. But, he complains about cases where, if he were to play the detached magistrate, he would have to "perpetrate those errors that the law requires." (MONEY TO BURN 184.) In seven such cases (25% of his docket), Devine makes intuitive judgments about the litigants or the lawyers and manipulates the proceedings to achieve what he deems to be "just" results. (These cases are summarized at R.99, Ex. 1-B, pp. 12-24.)

Devine's pattern of conduct on the bench—letting most cases unfold naturally, while steering only a handful of them to the conclusions he desires—bears a striking resemblance to this description of the 90c5009 district court:

> In response to the Council's written survey, respondents rated [the 90c5009 judge] above average in terms of lack of bias in both civil and criminal cases. Nevertheless, some attorneys interviewed about [the 90c5009 judge] questioned his impartiality, expressing the opinion that *early in the proceedings he forms an opinion about the parties, the merits, or the appropriate disposition of the case, and thereafter conducts the proceedings in such a way as to effectuate the desired outcome.* (emphasis added)

Chicago Council of Lawyers, *An Evaluation of the United States District Judges in Chicago* 24 (2006) ["*Federal Judicial Evaluation.*"]

### G.    Grove Fresh's February 1989 lawsuits.

Cecil Troy, Grove Fresh's principal, was 74 years old when he hired Hines in September 1988. (A.204, ¶5.) He hired Hines to investigate competitors, including Home Juice/American Citrus and Everfresh. Hines did not tell Troy about the covenants he had recently executed restricting his right to sue those firms. (A.146, 149-50.)  Six months later, Hines filed separate lawsuits for Grove Fresh against Everfresh, Flavor Fresh, American Citrus, and two others.[11] The complaints alleged claims for unfair competition under the federal Lanham Act and state common law, and claims for RICO violations.  The defendants filed motions to dismiss. (A.203-04, ¶3; A.207, ¶¶21-22.)

### 1.    The hiring of debtor as local counsel.

In August 1989, Hines and Grove Fresh retained debtor as local counsel. Hines did not tell debtor about the covenants restricting Hines's right to sue American Citrus and Everfresh. (A.147, 149-50.)

---

[11] The other defendants—Olympic Juice Co. and New England Apple Products Corp.—had no connections to the Home Juice entities or to Flavor Fresh.  Olympic Juice Co. went out of business shortly after Grove Fresh sued.  The case against New England Apple was tried to a jury and resulted in a $100,000 verdict. *Grove Fresh Distributors, Inc. v. New England Apple Products Co.,* 969 F.2d 552 (7th Cir. 1992).

### 2.    Hines's discharge

In November 1989, the district court denied Everfresh's and American Citrus's motions to dismiss Grove Fresh's claims for unfair competition. (A.218, ¶ 2.)  The court dismissed Grove Fresh's RICO claims for defects in pleading, but it granted Grove Fresh leave to cure the defects in an amended pleading. (A.218, ¶3.)

Several days later, a letter from McDermott Will & Emery disclosed the restrictions on Hines's right to sue Everfresh and Home Juice/American Citrus. The letter threatened to take "additional steps to enforce [Hines's covenant]" if Grove Fresh amended its RICO claims to include acts or omissions prior to the effective dates of Hines's covenants. (A.144.)

After receiving this letter, Grove Fresh fired Hines and hired debtor to replace him as lead counsel. (R.23, Attachment1, ¶5.) Over the next nine months debtor investigated claims that Hines had covenanted not to pursue. (*Id.*, ¶6.) His investigation, which included a search of public records in more than a dozen jurisdictions in the United States and Canada, led to the 90c5009 complaint. (A.14, ¶43.)

### 3.    The hiring of Rivkin Radler & Kremer as additional counsel.

In May 1990 Rivkin Radler & Kremer joined debtor as co-counsel on the Grove Fresh cases.  (A.357-58.)

### 4.    The settlement of the case against Flavor Fresh

In March 1990 Grove Fresh got an order compelling discovery from Flavor Fresh. Immediately afterwards a lawyer from McDermott Will & Emery, who represented both Everfresh and Flavor Fresh, proposed a settlement that included agreements to provide discovery from Everfresh in the 89c1113 case against that firm.  (A.149-50.)   The settlement agreement was executed by Everfresh's president and contained a particularized discovery program that required Everfresh to provide specified discovery by April 9, 1990. (A.150.)

### 5.    The 89c1113 defendants' suppression of evidence.

Everfresh failed to provide any discovery by the April 9 deadline, so Grove Fresh obtained an order compelling discovery.  (A.131.). Even so, the compelled answers and documents omitted much incriminating information, including the following:

- They omitted to disclose that the ingredients in Everfresh's orange juice included Oleum 320/IDEA. (A.135-36.)

- They omitted to disclose that a Labatt officer had learned about Everfresh's criminal practices in 1986, before Labatt even acquired the firm. (A.135.)

- They omitted to disclose the 1986 lawsuit alleging that Everfresh was making adulterated orange juice, which put Labatt on record notice that the firm it was acquiring was in fact adulterating orange juice. (A.131-32.)

- They omitted to disclose that Bruno Moser had knowledge of Everfresh's illegal practices. (A.150.)

### 6.    The 89c1113 confidentiality order

In May 1990 the district court granted a defense motion for an umbrella protective order in the 89c1113 case against Everfresh. By design, the confidentiality order did *not* authorize the automatic filing under seal of court papers that referred to documents designated as confidential. (R.24, Attachment 19, pp. 32-33.)

The only reason alleged in support of the "good cause" requirement in Fed. R. Civ. P. 26 was that the "complaint is premised on [Grove Fresh's] being a direct competitor of defendants," and that Grove Fresh was "seeking information about defendants' business, including customer names, addresses and sales data." (A.225, ¶43.)

Four years later the Contempt Order made a finding that the 89c1113 confidentiality order, and others like it, "were meant to prevent Mr. Messina's misuse of the litigation to pursue his own agenda." (A.367.) However, the papers relating to the entry of the 89c1113 confidentiality make no reference to any such purpose.

### 7.    The July 1990 challenge to claims of confidentiality

In June 1990 the 89c1113 defendants produced 600 business records (hereafter referred to as the "Batch Sheets") which documented Everfresh's manufacture of more than 3,200,000 gallons of adulterated orange juice in 1987, the year following Labatt's acquisition of the firm. (A.210-11, ¶¶29-31.) These Batch Sheets, when analyzed alongside other evidence Grove Fresh had collected, supported a claim that Labatt and its lawyers had made false statements to the FDA when, in May-June 1989,  they alleged, in support of a request for amnesty, that Labatt hadn't known about Everfresh's criminal conduct until 1989. (A.210-11, ¶29(a), 32.)

Invoking the umbrella protective order, the 89c1113 defendants designated the Batch Sheets as confidential.  Troy authorized debtor to challenge that claim for two reasons.  First, if the challenge succeeded, Grove Fresh could disclose the Batch Sheets to the FDA, and urge the agency to reconsider the amnesty granted to Labatt and its orange juice subsidiaries.  If the amnesty were revoked, and the FDA then indicted and convicted Everfresh and Holiday Juice, Grove Fresh could save substantial time and attorney's fees by

using the criminal convictions as collateral estoppel on the issue of liability. (A.212, ¶34.) *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979), which approved the doctrine of offensive collateral estoppel. Under that doctrine, a litigant who was not a party to a prior judgment may nevertheless use that judgment "offensively" to prevent a defendant from relitigating issues resolved in the earlier proceeding.

<u>Second</u>, during the years that Everfresh had sold misbranded products, Grove Fresh had gained an unfair reputation as a price gauger because of the higher prices it was required to charge for its authentic orange juice products. This reputation caused Grove Fresh to lose many customers. Troy thought Grove Fresh could restore its reputation, and win back some of those lost customers, if he could present them with proof that Everfresh had misrepresented the authenticity of its orange juice products. Troy believed that showing the Batch Sheets to his ex-customers would help him regain them as customers. (A.212-13, ¶36.)

The district court rejected the challenge. (A.214, ¶43.) Five years later, the Contempt Order characterized this challenge as an example of debtor "Mr. Messina's repeated attempts to beat the defendants into submission by disclosing materials previously designated as confidential to generate unfavorable publicity for them." (A.368.)

## H.    The 90c5009 case.

During his investigation of the claims that Hines had covenanted not to pursue, debtor obtained a computer printout from the Florida Department of Citrus dated May 13, 1975. The document, captioned "Everfresh OJ—Formula," listed 14 ingredients for making 1,028 gallons of "OJ." (A.110-14.) Twelve of the ingredients listed in the formula could not lawfully be added to a product labeled as "100% pure orange juice from concentrate." (A.85.)

On August 28, 1990, debtor filed a new lawsuit—the 90c5009 case—naming 13 defendants, including Everfresh, American Citrus, Holiday Juice, and Labatt. Flavor Fresh was named as a non-party co-conspirator—it couldn't be joined as a party-defendant because the March 1990 settlement between Grove Fresh and Flavor Fresh included a covenant not to sue the firm. Attached to the complaint as Exhibit 6 was the "Everfresh OJ—Formula" dated May 13, 1975. The complaint alleged:

24

- that the defendants, and others, had formed a RICO conspiracy no later than May 1975 to make and sell adulterated orange juice that was falsely labeled as 100% pure.

- that Labatt had joined the conspiracy no later than December 1986, when it acquired Everfresh and allowed Everfresh to continue making adulterated orange juice falsely labeled as 100% pure.

- that Labatt had made false statements to the FDA in May 1989 when, in order to obtain amnesty, it concealed the date on which it first learned about Everfresh's illegal practices.

(A.115-16; R. 7-A, ¶2.) The complaint did not include any allegations about Oleum 320/IDEA—Grove Fresh did not yet know about that unsafe additive.

### 1.    The emergency motion to seal the 90c5009 complaint

Four days before the 90c5009 complaint was ready for filing, Everfresh presented an emergency motion in the original case against it (89c1113) to require that the 90c5009 complaint be filed under seal. The motion alleged that the 90c5009 complaint would be an improper attempt to amend the complaint in 89c1113, and that Grove Fresh should not be allowed to file the new lawsuit unless it first obtained leave of court pursuant to Fed. R. Civ. P. 15(a). (A.219, ¶7.)

Debtor was served with the emergency motion about 45 minutes before the scheduled hearing; the hearing lasted less than one minute. (A.344-45, ¶11.) Because the alleged ground for the seal called upon the court to examine the contents of the not-yet filed pleading, debtor offered to file under seal "so long as we can have a status on Tuesday [August 28, 1990] and then discuss how we would dispose of the seal." (R. 23, Attachment 5, p. 2.) The district court agreed:

> THE COURT:    Right.  File it under seal, designate it as a related case and it will come to me, *and then we can sort out whether it should be under seal in the first place*, whether it is a related case, all of that stuff.

(*Id*.., p. 3.) [emphasis added].

Four days later, debtor filed under seal. The minute order authorizing the seal, which was prepared by the courtroom deputy before the 90c5009 complaint could be filed, stated in its entirety as follows:

*Plaintiff's* motion to file case under seal is granted. The complaint and all subsequent pleadings shall be filed under seal until further order of court. (R.21, p.4.)[12] [emphasis added]

The court did not schedule the August 28 hearing it had promised to hold, however. Debtor moved to vacate the seal on August 31, 1990, but the court denied that motion without explanation. (A.219, ¶8.)

### 2.    The procedural history of the seal order as described by the Contempt Order.

Five years after debtor stipulated to file the 90c5009 complaint under seal, the Contempt Order recited a procedural history different from the one just described. The Contempt Order omitted to disclose debtor's stipulation to file under seal. Referring to the defendant's emergency motion, the Contempt Order stated instead:

On 29 August 1990 I granted the motion to seal the complaint for case No. 90 C 5009….The minute order granting the seal in No. 90 C 5009…stated:

*Defendants'* motion to file case under seal is granted. The complaint and all subsequent pleadings shall be filed under seal until further order of court. (emphasis added)

The Contempt Order's quotation from the minute order came without editing marks; there was no signal that the court was changing the first sentence of the minute order from "Plaintiff's motion…" to "Defendants' motion…" The Contempt Order also made this finding as to why it had granted the defendants' emergency motion:

A key reason behind this decision was Mr. Messina himself. After presiding for the previous eighteen months over case No. 89 C 1113, I was familiar with certain tactics employed by Mr. Messina which I believed were questionable if not reprehensible. Specifically, I was wary of Mr. Messina's repeated attempts to beat the defendants into submission by disclosing materials previously designated as confidential to generate unfavorable publicity for them.[2]

Footnote 2 identified two so-called "attempts to beat the defendants into submission." Only one had occurred as of the date of the sealing order—the July 1990 challenge to the confidentiality of the Batch Sheets, discussed above at §G-7 (p.23). (A.214, ¶43.)

Finally, the court gave this explanation for why it had waited five years before issuing a written statement of its reasons for the seal:

---

[12] The text of the minute order is quoted at p. 4 of *Debtor's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment* (R.21), but the actual minute order itself was inadvertently omitted from the record on appeal. A copy is included at the end of the Appendix (A.__)

> Given the relatedness of the two cases and their litigants, and my familiarity
> with both, I felt it unnecessary to reiterate in my sealing order for the new case what
> seemed painfully clear from the lessons, and record, of No. 89 C 1113.

As of the date of the sealing order, however, the only rebuke of debtor in 89c1113 was for
his July 1990 challenge to the confidentiality of the Batch Sheets. (A.214-15, ¶¶42-44.)

### 3.    The suppression of the 90c5009 docket

From August 28, 1990 through May 16, 1995, the district court, without notice or a
hearing or a statement of reasons, suppressed the 90c5009 docket. During that period of
four years and nine months, Grove Fresh and debtor routinely filed their pleadings with the
deputy clerks of court on the 20th floor of the Dirksen Building. For reasons that have never
been explained, however, all of Grove Fresh's and debtor's filings—originals as well as
judge's copies—were forwarded to the district court's chambers without being stamped or
docketed. (A.53-54, ¶32.)

The defendants bypassed the 20th floor filing desk and filed all of their papers in
chambers. By the time the clerk began to create a 90c5009 record in May 1995, there were
about 359 un-docketed records in the case, most of which were in the 90c5009 court's
chambers. (A.52, ¶32; A.295, ¶¶5-7; A.297, ¶6.)

### 4.    The unsuccessful motion to dismiss the 90c5009 complaint

Everfresh and American Citrus moved to dismiss the 90c5009 complaint on the
exact same ground that Everfresh had urged for the seal—that the complaint was an
improper amendment of the February 1989 lawsuits. The gist of their argument was that all
of the new allegations in the 90c5009 complaint were "drawn from public sources" that were
available when Grove Fresh filed its first lawsuits in February 1989, and that too much time
had lapsed to permit Grove Fresh to use this public information in the 90c5009 complaint.
(A.220, ¶10.)

In March 1991, the district court denied the motions to dismiss. It also made a
finding that "the information [underlying the 90c5009 complaint] was obtained from public
agencies without help from the defendants or a court order." (R. 24, Attachmenrt 21, p. 8.)
Although this ruling disposed of the only articulated reason for the seal, the court kept the
seal in place without explanation. (A.220, ¶11.)

The case settled in April 1993 without any statement of why the seal was justified as
of the date the case was filed (August 28, 1990). (A.220, ¶12.)

### 5.    The 90c5009 confidentiality order

On May 1, 1991, the district court entered an umbrella confidentiality order in 90c5009.  The order was modeled on the 89c1113 confidentiality order and was submitted to the court as an agreed order. (A.225, ¶44.)

Four years later the Contempt Order made a finding that the 90c5009 confidentiality order, and others like it, "were meant to prevent Mr. Messina's misuse of the litigation to pursue his own agenda." (A.367.) However, the papers relating to the entry of the 90c5009 confidentiality make no reference to any such purpose.

### 6.    The order compelling a 17-year period for discovery

Grove Fresh's written discovery requests in 90c5009 sought information for a period of time beginning in January 1974, or 16 months before the date of the Exhibit 6 "Everfresh OJ—Formula."  The Home Juice/American Citrus defendants refused to provide any information about their manufacturing practices for the period prior to July 15, 1988; the Everfresh defendants refused to provide any such information for the period prior to January 1, 1983. (A.78-79.)

In January 1992, Grove Fresh filed a *Motion to Overrule Objections to Time Period*.  The motion was supported by a 23-page brief, including a 15-page statement of facts supported by 75 specific citations to deposition transcripts and documents. (A.78-100.) The statement of facts covered 10 topics, including:

1.  The history of the relationships between and among the corporate co-conspirators, from the 1950s to the present. (A.80-83.)

2.  The evidence showing that Home Juice and Everfresh had shared formulas from at least the late 1960s through the late 1980s. (A.83-84.)

3.  The evidentiary foundation for admitting the Exhibit 6 formula for "Everfresh OJ" into evidence, including the chain of custody from Everfresh to the Florida Department of Citrus. (A.84-86.)

4.  The history and particulars of the defendants' use of preservatives, including Oleum 320/IDEA (A.86-93.)

5.  Labatt's lack of candor with the FDA regarding Everfresh's illegal practices. (A.94-95.)

Grove Fresh's reply brief included nine pages of additional facts (A.116-25) supported by 25 specific citations to deposition transcripts and documents.

In July 1992, the district court granted Grove Fresh's motion and ordered the defendants to provide discovery for a 17-year period. (R. 8, Attachment 9.)

7.      **The press's challenge to the seal.**

Meanwhile, in October 1991 the district granted leave to the Ad Hoc Coalition of In Depth Journalists ("Coalition") to intervene in 89c1113 to challenge the breadth of that case's protective order, and to intervene in 90c5009 to challenge the validity of the seal order barring them from access to the 90c5009 papers and orders. (A.221, ¶17.)

The Labatt Judgment Creditors opposed the Coalition's challenge, arguing that the seal was justified because the 90c5009 complaint falsely accused them. However, they did not specify the purportedly false allegations, nor did they come forward with sworn denials of the complaint's allegations or any other evidence that the allegations of the complaint were false. (A.221, ¶18.)

The Labatt Judgment Creditors also argued that the 90c5009 complaint included confidential information subject to a protective order entered in case no. 89c1113. However, they did not specify the portions of the complaint that purportedly included information subject to the protective order. (A.221, ¶19.) This argument also contradicted their prior contention that all of the new allegations in the 90c5009 complaint were "drawn from public sources" that were available when Grove Fresh filed its first lawsuits in February 1989. (A.23-24.) It also contradicted the district court's finding that "the information [underlying the 90c5009 complaint] was obtained from public agencies without help from the defendants or a court order." (R. 24, Attachment 21, p. 8.)

8.      **The omission to rule on the claim that debtor had falsely accused the Labatt Judgment Creditors, and the consequences of that omission.**

On November 20, 1992, the district court denied the Coalition's claims for access, ruling that the seal should stay in place because it "serves to effectuate the purposes of the protective order entered in the [1989 case against Everfresh]." (R. 24, Attachment 22, p. 3.) The court also ruled that the seal was justified because "the complaint…contains allegations which would, if not filed in court and if untrue, be libelous." (*Id.*)

The court's order did *not* explain why the seal had been imposed in the first place. Nor did the court adjudicate the Labatt Judgment Creditors' central argument for the seal— that Grove Fresh and debtor had falsely accused them.

In mid-December 1992, the Coalition filed a notice of appeal. (A.361.)

I.       **The settlement negotiations, and related events.**

In the meanwhile, in September 1992 the Labatt Judgment Creditors offered to settle with Grove Fresh if debtor would propose a method of assuring them that he would not represent consumers in class actions against them. (A.220, ¶13.)

Believing that this offer was a solicitation to violate R.P.C. 5.6(b),[13] debtor refused it. His unwillingness to negotiate over a restriction on his right to practice law stalemated the negotiations. (A.360-61, ¶¶21-23.) Thereafter, Troy authorized debtor and co-counsel at Rivkin Radler & Kremer to file a memorandum opposing the Labatt Judgment Creditors in the Seventh Circuit, where they had moved to dismiss the Coalition's appeal as premature. (A.361, ¶¶24-25.) The Labatt Judgment Creditors threatened to terminate settlement negotiations unless Grove Fresh withdrew its memorandum.  (A.362, ¶27.) Debtor and Rivkin Radler & Kremer disagreed on how to respond to this threat. Rivkin Radler & Kremer then threatened to quit the case unless they were given absolute control over the litigation. (*Id.*)

Debtor told Troy that if settlement negotiations failed, Grove Fresh would be better served by yielding to co-counsel's demand because debtor, as a sole practitioner, did not have the resources to take the cases to trial on his own, whereas Rivkin Radler & Kremer had the necessary resources for a trial. (A.362, ¶28.)

Troy yielded to co-counsel's demand. (A.244, ¶18.) He signed a letter drafted by co-counsel that stated in its entirety as follows:

> This confirms our meeting today at Rivkin, Radler & Kremer.  You are hereby relieved of all responsibility in the handling of this matter.  Warren S. Radler and Dale R. Crider will act as our sole attorneys and trial lawyers.
>
> We very much appreciate all of your effort in getting this ready for trial and we are optimistic that the matter will be resolved favorably.
>
> *This will also advise you that you will continue to be entitled to receive 20% of any amount received by way of settlement or verdict.*  [emphasis added.]

(*Id.*) Under *In re Estate of Callahan*, 144 Ill. 2d 32, 578 N.E.2d 985 (1991), which holds that a discharged attorney loses his right to a contingent fee, debtor could not collect a contingent fee from Grove Fresh unless he continued in an attorney-client relationship with Grove Fresh after January 21, 1993.

---

[13] Rule 5.6(b) of the Rules of Professional Conduct provides: "A lawyer shall not participate in offering or making… an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties."

After January 21, 1993, debtor continued his appearance as an attorney of record for Grove Fresh; he later received a $400,000 contingent fee from Grove Fresh. (A.220-21, ¶¶14, 16; R. 7-A, ¶13.)

### 1.    The consumer class actions

On February 22, 1993, attorney Lawrence Walner filed a consumer class action complaint in the Circuit Court of Cook County, styled *Donley v. Marshall, et al.*, 93 CH 1610. The *Donley* complaint tracked the allegations in the related criminal case against Flavor Fresh, Peninsular Products, and the others. (A.261-62; R.8, Attachment 1, p.12, ¶25.)

Two days later, Walner filed two more consumer class actions. *Shore v. Powell, et al.*, 93 CH 1753, tracked the allegations of 89c1113 and alleged claims against Everfresh and Labatt. *Scorzo v. Lang, et al.,* 93 CH 1754, tracked the allegations of Grove Fresh's 1989 complaint against American Citrus and Lang and alleged claims against those defendants. (261-62; R.8, Attachment 1, p.12, ¶25.)

The plaintiffs in all three cases (collectively, "the Walner plaintiffs") alleged breaches of warranties and violations of RICO and consumer fraud statutes. The complaints did *not* allege any conspiracy among the defendants in the three cases. The Walner plaintiffs did not yet have access to the evidence in the 90c5009 files, so they were not aware of the evidence that would allow them to prosecute Labatt, Everfresh, Home Juice/American Citrus, and Flavor Fresh in a single action for a RICO conspiracy. (R.9, Attachment 1, p.5n.3.)

### 2.    The district court's role in the settlement negotiations.

During *in camera* settlement conferences in January-February 1993, the district court told the Labatt Judgment Creditors they could require debtor to sign a Legal Services and Consulting Agreement ("Consulting Agreement") as a means of restricting his right to practice law. By purporting to create an attorney-client relationship between debtor and the defendants, and by paying him $200,000 in consulting fees over 30 months, the Consulting Agreement would trigger conflicts-of-interest that would preclude debtor from representing the defendants' adversaries. (R.9, Attachment 1, ¶¶14-20.)

On February 19, 1993, debtor agreed to the terms orally, after 78-year old Troy, who was in failing health, asked debtor to accept those terms so that he (Troy) could put this litigation behind him before he was "pushin' up daisies." (A.345, ¶14.) Troy died a year later. (A.257.)

On March 10, debtor received the defendants' draft of the Consulting Agreement. The draft created a mechanism for buying debtor's silence, not his services, in that it:

- Barred debtor from any "communications or dealings with third parties on behalf of the [defendants]." (A.334, §1.)

- Barred debtor from telling anyone anything that he knew about the defendants' past or present activities. (*Id.*)

- Required debtor to turn over to the defendants every scrap of paper he had "relating in any way to [their] businesses." (A.337, §7)

- Barred debtor from telling anyone that he was under contract to the defendants. (A.334, §2)

After debtor refused to execute this draft, the district court, in an *in camera*, off-the-record conference, told him he'd be subject to a malpractice claim for the amount of the proposed settlement ($2,000,000) if Grove Fresh lost the settlement because of his refusal to sign the Consulting Agreement, and that such a claim could not be discharged in bankruptcy. (A.349, ¶26.)

Debtor signed the defendants' draft of the Consulting Agreement. (A.350-52, ¶¶29-33.) The settlement closed in April 1993. Afterwards, Grove Fresh paid debtor a $400,000 contingent fee. (A.220-21, ¶¶14, 16.)

### 3.    The district court's view that "[t]he defendants bought the case from the plaintiff."

After the settlement closed, the district court granted a defense motion to withdraw all papers from the courthouse except for the complaint, the answers, and the order dismissing the case pursuant to the settlement. The Coalition moved the district court for a stay of the removal of the records pending the outcome of its appeal, but the court denied that motion with the following explanation:

> THE COURT:                There is as far as I am concerned no case.  *The defendant bought the case from the plaintiff.*  And absent some strong reason not to permit that, which nobody has brought to my attention, *there is no case.*  And the only decision – in fact, technically it is not, I think, a decision.  It simply confirmed what the parties have worked out.  *And you are roughly in the same position as you were as if the case had never been filed in the first place.*

(R.23, Attachment 9, p. 6.)[emphasis added]  The Seventh Circuit stayed this order; the Coalition's appeal went forward.

**J.        The Post-Settlement Proceedings.**

In a July 1993 brief filed in the Seventh Circuit's public files and served on the press, the Labatt Judgment Creditors made the following claims:

- On August 23, 1990, a Grove Fresh lawyer sent them a letter "threatening to file a…lawsuit…which would contain unsubstantiated and scandalous allegations." The purpose of the alleged threat was "to extract a large settlement." (A.3, ¶3.)

- When the Labatt Judgment Creditors, refused to pay, the Grove Fresh attorney filed the complaint. (*Id.*)

- "[M]any of the allegations in the [90c5009] complaint were false, contained information derived from confidential discovery material subject to [a] protective order, and were designed to embarrass, harass, and falsely accuse defendants." (*Id.*, ¶5.)

- Grove Fresh's attorney "sought to misuse the District Court's files to harm Everfresh." The trial court, "[k]nowing the full status and history of the case in controversy…ordered that the…complaint be filed under seal." (A.3-4, ¶5.)

After learning about these arguments debtor rescinded the Consulting Agreement, tendered back the initial $50,000 installment, and demanded a retraction. (A.71.) The Labatt Judgment Creditors rejected debtor's rescission of the Consulting Agreement and refused to retract.  (*Id.*) They warned debtor not to respond to the charges they had made in the Seventh Circuit, claiming that debtor was barred from doing so by virtue of his duties under the Consulting Agreement. (*Id.*)

The Labatt Judgment Creditors also filed a motion seeking relief against debtor and Grove Fresh under Fed. R. Civ. P. 60(b). The motion alleged that as of August 1993, debtor was one of Grove Fresh's attorneys. (A.71.)

**1.        Debtor's motion for a hearing**

On October 22, 1993, debtor filed a motion asking the Seventh Circuit for a hearing on the charge that he had falsely accused the Labatt Judgment Creditors. The motion argued that the asserted justification for the seal effectively charged him with the crime of intimidation, a class three felony; of having filed a groundless complaint in violation of Rule 11; and of having violated at least five Rules of Professional Conduct. (A.4, ¶7.) He argued that he had a right to be heard before the court of appeals ruled on those charges in a public opinion. (A.7-10.) To rebut the charge that he had falsely accused the Labatt Judgment Creditors, his morion described some of the evidence underlying and corroborating the 90c5009 complaint. (A.28-31.)

The Labatt Judgment Creditors moved to strike debtor's motion for a hearing. They alleged that debtor had been discharged by Grove Fresh on January 21, 1993, and that he had no standing because he represented no one in the case. (R.24, Attachment 33, ¶¶2, 5, 15.) On November 9, 1993, a single Seventh Circuit judge granted their motion. (A.72.)

### 2.  October 28-31: Moser's untruthful affidavit, and the *New York Times'* front-page story.

On October 28, 1993, in the Western District of Michigan, the Department of Justice filed an affidavit from Bruno Moser in the sentencing proceedings against Kohlbach. In this affidavit Moser described his dealings with Kohlbach starting "in the late 1970s or very early 1980s." (A.201, ¶4.) He stated that Everfresh had ceased using Kohlbach's chemical mix in "1986 when Labatts [sic] purchased Everfresh and we were directed to discontinue its use." (A.202, ¶12.)

Moser's sworn statement was untrue. The sealed files in 90c5009 included business records showing that in 1987-88, Everfresh made at least six purchases of Oleum 320/IDEA for which it paid in excess of $250,000.  The records also showed that Moser had supervised these purchases. (A.65, ¶23.)

On Sunday, October 31, 1993, the *New York Times* published a front-page story on orange juice adulteration that included accounts of the criminal case in the Western District of Michigan and the Grove Fresh litigation in the Northern District of Illinois. (R.24, Attachment 37, pp. 382-83.) The *New York Times* reporter had access to Moser's affidavit in the criminal case files in the Western District of Michigan, but not to the sealed records in 90c5009 that contradicted that affidavit.

### 3.  The contempt proceedings.

In November 1993, the Labatt Judgment Creditors petitioned the district court to cite debtor for contempt for statements made in his papers to the Seventh Circuit. (A.74, ¶65.) Two months later they filed a Rule 11 motion asking the district court to sanction debtor for allegedly misrepresenting his status as a Grove Fresh attorney in his October 1993 motion in the Seventh Circuit. (A.76, ¶66.)

### 4.  The remand of the Coalition's appeal, and the oral explanation for the seal.

In May 1994 the Seventh Circuit remanded the Coalition's appeal with instructions that the district court explain why it had sealed the case. *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.,* 24 F.3d 893, 898-99 (7th Cir. 1994). The district court offered an

explanation five months later, on October 27, 1994. At a hearing where neither debtor nor his counsel was present, the court stated that it had three reasons for sealing 90c5009, and that the "principal" reason was the court's low opinion of debtor's character. (A.73-74.)

On November 22, 1994, debtor asked for leave to file a memorandum challenging the factual premises for the court's adverse opinion of his character. The court denied his motion. (A.74, ¶64.)

### 5.    The finding regarding the attorney-client relationship between debtor and Grove Fresh post-January 21, 1993

Throughout the post-settlement proceedings the defendants made a number of contradictory contentions about debtor's status as a Grove Fresh attorney after January 21,1993. On three occasions they alleged that debtor continued as a Grove Fresh attorney after January 21, 1993; on five other occasions they alleged that he had been discharged by Grove Fresh on that date. (R. 7-A, ¶17)

The district court resolved these contradictions on December 1, 1994, when it ruled on a defense motion to compel discovery of communications between Grove Fresh and debtor on and after January 21, 1993. Grove Fresh had objected to this motion on the ground that the communications were protected by the attorney-client privilege—*i.e.*, that debtor and Grove Fresh had continued as attorney and client after January 21, 1993. The district court sustained Grove Fresh's claim of privilege. The court based its ruling on an *in camera* review of ten letters and memos that Grove Fresh and debtor had exchanged on and after January 21, 1993. (R. 7-A, ¶18)

### 6.    The recusal motion and the Section 1927 motion

In January 1995 debtor moved to recuse the district court on the ground that the court had previously taken a position on a disputed issue in the post settlement proceedings, *i.e.*, the ethical propriety of the Consulting Agreement. (R. 9, Attachment 4, pp. 2-4.) He also moved to dismiss all of the post-settlement proceedings on the ground that the proceedings were vexatious, and that they had been instituted for the improper purpose of enforcing an unethical restriction on his right to practice law. (R. 9, Attachment 1.) The court denied both motions. (R. 9, Attachment 1; R. 7-A, ¶20.)

### 7.    The February 1995 agreed order that would have created an official record of 90c5009 record.

On February 1, 1995, the district court signed an agreed order removing the seal from certain 90c5009 papers; implicitly, the order authorized the clerk of court to create a

docket for 90c5009. (A.240, ¶5f; A.246, ¶35; A.295, ¶¶8-9.) For reasons that do not appear in the record, the court declined to transmit the order to the clerk of court, despite repeated requests by debtor. (*Id.*) As a result, the creation of a docket was delayed for three and one-half more months, until May 16, 1995.

### 8.    The contempt trial

On February 3, 1995, the district court held a one-day bench trial on the contempt and Rule 11 charges. (R.24, Attachment 19.)

### 9.    The partial docket created on May 16, 1995.

On May 16, 1995, the district court released to the clerk of court *some* of the 90c5009 papers and orders for the period prior to the April 1993 settlement. The court kept possession of *all* the post-settlement papers, including all of the pleadings and motions that would become the subject of the Contempt Order's rulings. (R. 7-A, ¶25; A.297-98, ¶¶6-7.) As a result, *none* of the post-settlement papers were entered on the docket created on May 16, 1995.

### 10.    The appeal from the denial of the §1927 motion

In the meanwhile, on March 2, 1995, debtor filed an appeal from the order denying his §1927 and recusal motions.  The record on appeal was delayed because the district court refused debtor's requests to transmit to the clerk of court the agreed order that would have created a record.  *See* §7, above.

During this delay, the Labatt Judgment Creditors and Grove Fresh—now controlled by trustees of Troy's estate, who had no personal knowledge of the relevant facts and had ceded control of the litigation to Rivkin Radler & Kremer (R.9, Attachment 1, p.21, ¶52)—settled the Rule 60(b) claims. Pursuant to that settlement, Grove Fresh joined the defendants in a motion to dismiss debtor's appeal on the ground that debtor lacked standing because Grove Fresh allegedly had discharged him on January 21, 1993. Grove Fresh joined in this motion even though it had previously argued and won a claim that debtor and it had continued in an attorney client relationship after January 21,1993. (R. 7-A, ¶21.)

On June 9, 1995, the Seventh Circuit granted the Labatt Judgment Creditors' and Grove Fresh's joint motion to dismiss debtor's appeal on the ground that he had been discharged by Grove Fresh as of January 21, 1993. As of the date of this ruling, the clerk of the district court had not transmitted any record of the trial court proceedings to the court of appeals. (R. 7-A, ¶24.)

### 11.     The five-year prior restraint.

On June 9, 1995, the district court issued the Contempt Order, citing debtor for civil and criminal contempt.  The Order included a finding that the court had sealed 90c5009 because in the 89c1113 case, debtor had showed he had a personal agenda "to hurt [the Labatt Judgment Creditors] by disseminating information for purposes of damaging them outside the walls of the courtroom." (A.367.)  In support of this characterization the court cited one incident prior to the date the 90c5009 case was filed: debtor's July 1990 attempt to include the Batch Sheets in a report to the FDA.

The Contempt Order included a prior restraint that barred debtor from speaking about the orange juice litigation for a period of five years unless he first obtained the district court's prior approval, which the court would give only if debtor showed a public source for his proposed speech. (A.389.)  The Contempt Order also:

- required debtor to post a $50,000 cash bond, which would be forfeited if debtor ever spoke about the case without the district court's prior approval. (A.389.)

- sanctioned debtor $4,000 under Rule 11. (A.389.)

- required debtor to pay the defendants' attorney's fees (A.389), which were later calculated to be $149,554.

### 12.     The Rule 11 sanction regarding debtor's status as a Grove Fresh attorney.

The Contempt Order also included a finding that Grove Fresh had discharged debtor on January 21, 1993.  This finding reversed the December 1994 adjudication that debtor and Grove Fresh had *continued* as attorney and client after January 21.1993. *See* §J-5 (p. 35), above. The Contempt Order did not disclose that prior ruling, however, much less did it explain why the court had changed its mind. (R. 7-A, ¶23.)

In support of this finding the court quoted from the letter whereby debtor was "relieved of all responsibility" for the Grove Fresh litigation.  The Contempt Order did not quote the entire letter (*see* §I [p. 30], above); it omitted the final sentence of the letter—the sentence reaffirming debtor's right to collect a contingent fee.  It also omitted to disclose that Grove paid that contingent fee three months later.

### 13.     The *Chicago Tribune* article and the ARDC investigation.

Matt O'Connor, a *Chicago Tribune* reporter, called debtor and asked for a comment on the Contempt Order.  Debtor declined, citing the prior restraint.  (R.99, Ex. 1, ¶12.)  On June 12, 1995, O'Connor published an article that repeated many of the Contempt Order's

comments criticizing debtor's character, without any rebuttal comments from debtor. (R.8, Attachment 37; R.99, Ex. 1, ¶12.)

The *Chicago Tribune* article came to the attention of the Illinois Attorney Registration and Disciplinary Commission ("ARDC"), which opened an investigation of debtor.

### 14.    The problems with the record on appeal.

After debtor filed a notice of appeal from the Contempt Order, he attempted to file his trial exhibits with the clerk of court for inclusion in the record on appeal, as he was entitled to do pursuant to Fed. R. App. P. 10. However, the deputy clerk on the appeals desk refused to accept the exhibits, stating that she had been instructed not to accept any papers from debtor without the district court's prior approval. (A.295-96, ¶10; R. 7-A, ¶26.)

In about August 1995, debtor moved the district court to release to the clerk of court the pleadings, motions and other papers that were the subject of the Contempt Order. On September 9, 1995, the district court denied that motion. (A.240, ¶5h.)

### 15.    Jenner & Block's reconstruction of the record, at a cost of $40,000.

In August 1995, Jenner & Block agreed to represent debtor in appealing the Contempt Order to the Seventh Circuit and in defending debtor in a parallel investigation at the ARDC. (R. 7A, ¶29) Thereafter, a Jenner & Block lawyer spent two years reconstructing an official record of the 90c5009 case at a cost of $40,000 in fees. An official record of the proceedings underlying the Contempt Order was finally completed in April 1997. (A.296, ¶11; R. 7-A, ¶¶27-28.)

### 16.    Jenner & Block's undisclosed conflict of interest

Three years after Jenner & Block agreed to represent debtor, the firm disclosed that its representation of debtor had conflicted with its financial interest in representing other clients ("Other Clients") who had cases on the 90c5009 court's calendar, or whose cases would be assigned to that court's calendar in the future. (R. 7A, ¶¶30-31.)

Jenner & Block concluded that if it were to make any arguments on debtor's behalf that challenged the integrity of the 90c5009 proceedings, the firm would have to disclose those arguments to, and obtain the prior consent of, the Other Clients. The firm believed that if it sought such consent, some or all of the Other Clients might refuse to give it and might cease doing business with the firm. Therefore, the lawyers representing debtor refrained from making any arguments on appeal, or in the related proceeding at the ARDC,

that would require the firm to make disclosures to, and seek the prior consent of, the Other Clients. The firm imposed this limitation on the representation in 1995 without disclosing it or the underlying conflict to debtor. (R. 7A, ¶¶30-31.)

The briefing of debtor's appeal was completed in the fall of 1997. The briefs filed by Jenner & Block did not include any arguments questioning the integrity of the proceedings underlying the Contempt Order. (R. 7A, ¶32.)  They did, however, make arguments alleging violations of the First Amendment and due process.

### 17.    The Seventh Circuit's unpublished ruling.

On February 5, 1998, the Seventh Circuit issued a five-page unpublished order affirming the Contempt Order. The court's affirmance did not address the merits of debtor's First Amendment or due process arguments. (2/5/98 Mem. Op., p. 4.) (R. 7A, ¶33.)

### 18.    The ARDC investigation

In July 1998, after the ARDC investigation had escalated into a referral to an Inquiry Panel, Jenner & Block withdrew from representing debtor in that forum. Jenner & Block withdrew because representing the debtor effectively would require the firm to present facts and arguments that would call into question the integrity of the proceedings underlying the Contempt Order. Jenner & Block was unwilling to present such facts and arguments because of its financial interest in continuing to represent Other Clients with cases on the district court's calendar. (R. 7A, ¶34)

In a Memorandum that debtor filed *pro se* in November 1998, debtor presented to the ARDC Inquiry Panel the facts and arguments that Jenner & Block had been unwilling to present because of its conflict of interest. (A.226-96.) Six weeks later, the Panel closed its investigation without voting a complaint. (R. 7A, ¶35.)

### K.    The injunctions barring debtor from participating in state court proceedings as either a lawyer or witness.

#### 1.    The injunction barring debtor from filing a state court class action complaint.

In 1996 debtor submitted for the district court's prior approval a class action complaint he proposed to file in the Circuit Court of Cook County against the Labatt Judgment Creditors, among others.  The 90c5009 court was "satisfied that Mr. Messina, in his proposed complaint, does not reveal information which has been deemed confidential." (A.267.)  Nevertheless, the court barred him from filing the complaint, on the ground that the court "was not satisfied, based on past experience, that Mr. Messina should serve as class

counsel." (*Id.*) The district court made this finding without notice, without affording debtor a hearing, and without identifying the federal jurisdiction for adjudicating the fitness of a lawyer to serve as class counsel in a state court proceeding. (A.267.)

### 2. The proposed settlement of the state-court class actions.

In 1993 the Walner plaintiffs had moved to intervene in the Grove Fresh litigation to gain access to Grove Fresh's pleadings and discovery. (A.268.) They gained access sometime in 1995. (A.269.) In December 1995 they agreed to suspend further discovery while they and the Labatt Judgment Creditors negotiated over a global settlement. As of the date discovery was suspended, the Walner plaintiffs had not taken a single deposition. (A.269.)

The Labatt Judgment Creditors' agreement to enter into global settlement discussions was conditioned on two promises: (1) the Walner plaintiffs promised not to file a conspiracy claim seeking to hold the Labatt Judgment Creditors jointly and severally liable for the $45 million in damages caused by Flavor Fresh and Peninsular Products, and (2) the Walner plaintiffs promised that at settlement, they would release the Labatt Judgment Creditors from joint and several liability for those damages. (A.269.)

In February 1998 the Seventh Circuit affirmed the Contempt Order including the five-year prior restraint on debtor. Shortly afterwards, the Walner plaintiffs and the Labatt Judgment Creditors moved the state court for, and received, preliminary approval of the following terms of settlement:

- Mr. Walner would receive a fee of $1,000,000.

- Mr. Walner's clients, and the absent class members they represented, would release the Labatt Judgment Creditors from all joint and several liability for the damages caused by Flavor Fresh and Peninsular Products.

- As compensation to the class the Labatt Judgment Creditors would issue over a three-year period two different types of discount coupons with a total face value of $22.5 million.

(A.269.) The statements filed in support of the settlement did not analyze the real value of the settlement, *i.e.*, the rate at which consumers were likely to redeem the coupons. (A.270.)

### 3. The injunction barring debtor from communicating non-confidential information to consumers objecting to the proposed class action settlement

Certain absent class members objected to the proposed settlement. Their lawyer petitioned the 90c5009 district court for relief from the prior restraint so that debtor could provide him with information relevant to the hearing on the fairness of the settlement.

(A.272.) He asked for permission to receive a copy of debtor's proposed state-court complaint, which the district court had already found to be based on information in the public domain; the court denied that request. He also asked for leave to call debtor as a witness at the fairness hearing and to have debtor testify as to facts in the public domain that supported the objections to settlement; the district court denied that request as well. (A.272.)

On the afternoon of March 31, 1998, the state court gave final approval to the settlement. (A.272.) An appeal followed, but the settlement was affirmed.

### L.    Statement of Facts Regarding this Bankruptcy Case.

#### 1.    The Labatt Judgment Creditors' Adversary Action.

On December 23, 1999, the Labatt Judgment Creditors filed the 99-A-1573 complaint, seeking to except from discharge the judgment awarding them $149,554 in attorney's fees, plus accrued interest. Invoking 11 U.S.C. §523(a)(6),[14] they alleged that the injury for which they were awarded attorney's fees was "willful[ly] and malicious[ly]" caused by debtor, but they did not describe what debtor had done to cause that alleged injury. Instead, they cited the Contempt Order, attached a copy as an exhibit, and declared that the Contempt Order was "hereby incorporated in full." (R.1, p. 3.)

Debtor filed an answer, an affirmative defense, and a counterclaim. (R. 4.) The affirmative defense alleged that "the proceedings underlying the Contempt Order were so lacking in fundamental fairness that the Contempt Order should not be accorded preclusive effect herein." (R.4, p.25.) The counterclaim sought damages for tortious interference with debtor's contractual relations with orange juice consumers.

Debtor (R. 5, 7, 7-A, 8-10, 18, 21-25) and the Labatt Judgment Creditors (R.12-16, 27) filed cross-motions for summary judgment. The Labatt Judgment Creditors argued that under the collateral estoppel doctrine, the Contempt Order's findings of fact were binding on debtor on the issue of whether his conduct towards them was "willful and malicious."

Debtor's supporting papers included a total of 114 Statements of Uncontested Facts that conformed to the requirements of what was then Local Bankruptcy Rule ("LBR") 402.M and 402.N, now LBR 7056-1 and 7056-2. (A.43-60, 64-77.) The Labatt Judgment Creditors failed to respond to debtor's Statements, as required by LBR 7056, on the ground

---

14 Section 523(a)(6) provides that "[a] discharge under [the Bankruptcy Code] does not discharge an individual debtor from any debt…for willful and malicious injury by the debtor to another entity or to the property of another entity ."

that doing so "would be a significant waste of time, money and judicial resources." (R. 14, p. 3n.2.) Citing *Johnson v. Gudmundsson*, 35 F.3d 1104, 1108 (7th Cir. 1994), debtor argued that their failure to comply with LBR 7056-2 should be treated as binding admissions to each and every paragraph of debtor's Statements. (R. 18, p. 2.)

In a Memorandum Opinion dated March 27, 2000, the bankruptcy court denied debtor's motion for summary judgment and granted the Labatt Judgment Creditors' cross motion. (R. 28.) The court made the erroneous finding that all of the litigants "filed the requisite [7056-2] statements and other supporting materials upon which they rely." (R.28, p. 4.) The court dismissed debtor's Statements as "not relevant." (*Id.*) The court declined to rule on the merits of debtor's affirmative defense, declaring that it had no jurisdiction to consider a collateral attack on the fairness of the procedures underlying the Contempt Order because of the "[bankruptcy court's] position in the federal hierarchy, which is below that of the District Court." (R. 28, p. 11.)

### 2.    Debtor's motion for a Rule 7054(b) certification.

The summary judgment ruling was not a final appealable order within the meaning of Bankruptcy Rule 7054(a) because it did not adjudicate debtor's counterclaim.  In February 2001, debtor moved the court to certify that there was no just reason to delay entry of a final judgment on the complaint (R.35), but the court denied the motion (R. 36.)

### 3.    Adversary Action No. 03-A-1803.

On May 1, 2003, debtor sued the trustee and the Labatt Judgment Creditors for a declaratory judgment that the $50,000 Fund (described above at pp. 4, 5) was not property of the estate. (R.41.)

On May 27—before any other defendants had answered, and before discovery had even commenced—the trustee moved for summary judgment.  (R.50-52.) The court fixed August 28 as the date for debtor's response. Debtor served discovery requests returnable before his summary judgment response. The defendants didn't answer; debtor moved to extend the time for his summary judgment response until after the defendants answered discovery. (R.56. ¶¶1-6.) The court denied his request. (R.57.)

After receiving some discovery, but not all that he had requested, debtor filed his summary judgment response, but it was late. (R.58-60.) The trustee did *not* object to the late filing. Nevertheless, the court rejected it as out of time and ruled that as a result, all of the

material facts in the trustee's LBR 7056-1 statement were deemed admitted. (R.62, pp. 5-7.) On that basis, the court granted the trustee summary judgment. (*Id.*)

### M.    Note regarding debtor's FRCP 60(b) motion.

After the summary judgment in 99-A-1573, debtor filed a FRCP 60(b) motion to vacate the Contempt Order. The district court summarily denied that motion; the Seventh Circuit affirmed. *Grove Fresh Distributors, Inc. v. John Labatt Ltd.*, 299 F.3d 635 (7th Cir. 2002). The Labatt Judgment Creditors never sought to include in the bankruptcy court record the record of that appeal, so they cannot rely on that record to make their arguments here. Should they nevertheless attempt to do so, debtor will show in his reply why that record does not bar the relief sought in this appeal.

### SUMMARY OF ARGUMENT

Congress has authorized the FDA to use publicity to punish those who violate the food purity laws. 21 U.S.C. §375. The Supreme Court has instructed lower courts to favor open judicial proceedings over secret ones because open proceedings are "more conducive to clearing up the truth." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 597 (1980) (Brennan, J., concurring) [quoting 3 Blackstone, COMMENTARIES, at * 373.]

These policies were pertinent to claims against the Labatt Judgment Creditors, who violated the food purity laws every day for nearly 30 years. (§D-4, above.) Grove Fresh's lawsuits threatened to bring their crimes to the FDA's attention. If the FDA prosecuted, the marketplace would learn about their unsavory history, leading to immediate, and perhaps irreparable, economic harm. (*See* §B-3 [p. 12], above.)  To avoid that harm, Labatt deceived the FDA into granting amnesty to Labatt and its orange juice subsidiaries. (§E-3 [p. 20], above.) Then, they concealed from Grove Fresh any evidence that might have revealed that deception. (§G-5 [p. 23], above.)

After a painstaking, nine-month investigation of government records in more than a dozen jurisdictions, Grove Fresh uncovered some of the false statements that induced the amnesty. The district court, however, would not let Grove Fresh's evidence see the light of day. Elevating its preference for secrecy over the openness favored by Congress and the Supreme Court, the district court took the following steps to protect the Labatt Judgment Creditors from the consequences of their crimes:

1.  In July 1990, it barred debtor from communicating truthful information to the FDA.

2.  In August 1990, it sealed the 90c5009 case.

3.  Between August 1990 and May 1995, it barred the clerk of court from creating a docket for 90c5009, in derogation of FRCP 79(a), so there was no official record of the case, and none of the court's orders could be appealed.

4.  To protect the Labatt Judgment Creditors from consumers and other potential plaintiffs, it engineered a settlement contract in 1993 that restricted debtor's right to practice law, in violation of R.P.C. 5.6(b).

5.  As part of that 1993 settlement, it allowed the Labatt Judgment Creditors to "[buy] the case from the plaintiff," and authorized them to remove the 90c5009 records from the courthouse, in violation of Seventh Circuit policy.[15]

6.  To facilitate the defense of this "sale" in the Seventh Circuit, where journalists were prosecuting an appeal seeking access to 90c5009 records, the court gave its blessing to the argument that debtor had falsely accused the Labatt Judgment Creditors in order to "extract" a large settlement from them.

Debtor balked at becoming a scapegoat, so he asked the Seventh Circuit for a hearing. Stymied by the lack of an official record, that court remanded and asked the district court to disclose its reasons for the seal.

Given the facts known to the district court but still not part of any official record, the district court should have respected FDA and Supreme Court policy and vacated the seal. Doing so would have opened the 90c5009 files to vigilant journalists; they would have recognized Moser's perjury and investigated the role that his perjury may have played in getting amnesty for the Labatt Judgment Creditors.

Vacating the seal would also have opened the files to diligent lawyers for consumers; they would have learned about the grounds for holding deep-pocket Labatt answerable for $42 million in damages caused by out-of business co-conspirators.

Vacating the seal, however, would have embarrassed the district court. Journalists and lawyers alike would have seen that the court had protected the defendants and their lawyers from suffering any consequences for their deceitful conduct. They would also have discovered the active role played by the court in restricting debtor's right to practice law, in violation of the Rules of Professional Conduct. (A.349-50, ¶¶25-28.)

The district court spared itself those embarrassments, kept Moser's perjury under wraps, and otherwise protected the deep-pocket defendants. The means and methods the court used to accomplish these improper ends (described, in part, at R.99, Ex. 1, ¶¶9-11),

---

[15] *See Matter of Memorial Hospital of Iowa County, Inc.*, 862 F.2d 1299, 1302 (1988) (holding that judicial records are public property that cannot be bought and sold by private parties). The Seventh Circuit stayed the removal of the records.

invite a withering critique, but doing justice in this appeal does not require this court to make that critique.

Doing justice in this appeal requires only that this court find that debtor did not cause the Labatt Judgment Creditors a "willful and malicious injury," and that it grant the other relief, described below, that logically follows from such a finding.

I.    **THE COURT SHOULD ENTER SUMMARY JUDGMENT FOR DEBTOR ON THE 99-A-1573 COMPLAINT BECAUSE THE $149,554 FEE AWARD IS DISCHARGEABLE.**

The Labatt Judgment Creditors' complaint in 99-A-1573 did not particularize the conduct underlying the $149,554 fee award; doing so would have shown, as a matter of law, that they were not entitled to any relief. (§A, below.) Instead, they attached the Contempt Order to the complaint, incorporated it by reference, and argued that debtor was collaterally estopped from disputing that he had acted willfully and maliciously.

The bankruptcy court agreed, but it erred in doing so. (§B, below.) This court should correct that error, reverse the summary judgment for the Labatt Judgment Creditors, and enter summary judgment for debtor. (§C, below.)

A.    **As a matter of law, asking for a hearing to respond to defamatory charges is not a malicious act.**

The undisputed facts show that on October 20, 1993, debtor asked the Seventh Circuit for a hearing on the Labatt Judgment Creditors' claim that he had falsely accused them in order to "extract" a $2,000,000 settlement. (A.8, ¶¶22-23.)  The undisputed facts also show that this request triggered the contempt proceedings that led to the $149,554 fee award in their favor. (A.8, ¶24.) As a matter of law, these facts cannot sustain a claim that the conduct underlying the fee award was "malicious," meaning that it was "in conscious disregard of [debtor's] duties or without just cause or excuse…."  (R.28, p. 14.)

 "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). Here, the Labatt Judgment Creditors were asking the government for relief that, if granted, would label debtor as an unethical lawyer who used false pleadings to extort a big-money settlement. Because their request could not be granted without defaming debtor, he had just cause to ask for a hearing. The bankruptcy court erred in finding otherwise.

**B.    The bankruptcy court erred by giving preclusive effect to the Contempt Order's findings on the issue of malice and willfulness.**

    **1.    The structural errors underlying the contempt proceedings rendered those proceedings unfair *per se*.**

Collateral estoppel does not apply "if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana v. United States*, 440 U.S. 147, 164n.11 (1979). *See also* RESTATEMENT (SECOND) OF JUDGMENTS §28(3). Here, the contempt proceedings were unfair *per se* because they were conducted in violation of debtor's structural right to a public trial.

A defendant has a right to a public trial "so that the public may see that he is fairly dealt with and not unjustly condemned." *In re Oliver*, 333 U.S. 257, 270n.25 (1948). The right to public scrutiny extends beyond the actual proof at trial to include pretrial proceedings. *Waller v. Georgia*, 467 U.S. 39 (1984). "The right to an open public trial is a shared right of the accused and the public, the common concern being the assurance of fairness." *Press-Enterprises Co. v. Superior Court of California*, 478 U.S. l, 7 (1986).

Here, as of the date of trial (February 3, 1995), there was no official record of the case, so the public had no information about the pretrial proceedings against debtor. Moreover, the three confidentiality orders that he was charged with "willfully and maliciously violating" were under seal, as were the specific charges against him and his defenses thereto. Without this basic information, the public lacked the tools essential to an effective scrutiny of the proceedings against debtor.

The right to public scrutiny of a judicial proceeding is a structural right. *Neder v. United States*, 527 U.S. 1, 8 (1999), citing *Waller v. Georgia*, 467 U.S. 39 (1984). Whereas constitutional errors affecting the presentation of evidence at trial are reviewed under the "harmless error" standard of *Chapman v. California*, 386 U.S. 18 (1967) and FRCP 61, deprivations of structural rights are reversible *per se* because they "infect the entire trial process," *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993) and "necessarily render a trial fundamentally unfair," *Rose v. Clark*, 478 U.S. 570, 577 (1986).

The bankruptcy court should have found that the proceedings underlying the Contempt Order were unfair *per se,* and therefore were not entitled to preclusive effect, because they were conducted in derogation of debtor's structural right to public scrutiny of the proceedings against him.

2.      **Debtor was not fully represented in the contempt proceeding.**

Collateral estoppel requires a showing that debtor was fully represented in the trial court and on appeal in the prior proceeding. Full representation includes representation by counsel free from undisclosed conflicts of interest. *See Amchem Products, Inc.* v. *Windsor, 521 U.S.* 592, 625-26 (1997) (reversing class action settlement in which class counsel had conflicts of interest that affected adequacy of their representation).

Here, the undisputed facts show that debtor's appellate counsel had an undisclosed conflict of interest, and that the conflict unfairly limited the arguments that appellate counsel was willing to present on appeal. (A.55-56, ¶¶37-40.)

Since the omitted arguments compelled a reversal of the Contempt Order (A.56, ¶¶41-42), debtor was not "fully represented" in the prior proceeding. The bankruptcy court erred in finding otherwise.

3.      **The Contempt Order's ultimate finding on willfulness rested on predicate findings that were never actually litigated, decided, or subject to appeal.**

In the Contempt Order, the district court made findings about debtor's conduct at three stages of the Grove Fresh litigation: (1) prior to the issuance of the three confidentiality orders in May 1990, August 1990, and May 1991; (2) after the confidentiality orders issued, but before the April 1993 settlement; and (3) after the 1993 settlement.

The district court found that at stage (3), debtor acted "willfully" when he made disclosures in derogation of the confidentiality orders. This finding of willfulness rested on subsidiary findings regarding debtor's conduct at stages (1) and (2). However, the facts regarding debtor's conduct at stages (1) and (2) were never actually litigated or decided prior to the April 1993 settlement and dismissal. *See, e.g.,* §§G-6 (pp. 23-24); H-1-2, 5 (pp. 26-28). Since there were no findings adverse to debtor as of the date of dismissal, debtor had no standing to take an appeal from any of the confidentiality orders.

This procedural history is critical because collateral estoppel applies only to issues that were actually litigated, decided, *and subject to appeal.* Wright, Miller & Cooper, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 2d §4419 (2009) (issues must be litigated and decided); *Gelb v. Royal Globe Insurance Co.*, 798 F.2d 38, 45 (2d Cir. 1986) (collateral estoppel does not apply to issues that have not been reviewed by the appellate court in the prior proceeding.) Because debtor's alleged conduct prior to April 1993 was never actually

litigated, decided, or subject to appeal, the district court could not make findings about that conduct without affording him notice and opportunity for a hearing, which it failed to do.

### 4. The predicate findings underlying the Contempt Order's ultimate finding on willfulness were based on judicial intuition, not on evidence adduced at trial.

The second paragraph of the Contempt Order states that the district court issued the confidentiality orders "to prevent Mr. Messina's misuse of the litigation to pursue his own agenda." (A.367.) The narrative in the 71 paragraphs that follow appears to support this statement, but the descriptions of litigation events in those 71 paragraphs are based solely on the court's intuition, not on evidence subject to cross-examination at an adversary proceeding.

Judicial intuition is no substitute "for the evidence and careful analysis" that the adjudication of a complex case requires. *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 283 (7th Cir. 2002) (reversing the 90c5009 district court in an unrelated case and reassigning the case on remand per Circuit Rule 36). The 90c5009 district court violated this norm when, in the Contempt Order, it used intuition to create findings that were the predicates for labeling debtor's conduct as "willful and malicious." Because these predicates were not based on evidence, the bankruptcy court should not have given preclusive effect to the ultimate finding of willfulness that rested on them.

### 5. The Contempt Order is not a reliable account of the underlying proceedings.

As a practical matter, federal litigation records are inaccessible to anyone other than the litigants themselves and the federal judiciary. R. Posner, "In the Fraud Archives," *New Republic* 29 (April 19, 1999) ["*In the Fraud Archive*"]  When a journalist reports or comments on a legal proceeding, the inaccessibility of the underlying records imposes a moral duty on the journalist to give a candid and sufficiently complete account of that proceeding. (*Id*.; *see* R.99, Ex. 1-A, pp. 3-4.) A journalist should not withhold critical details just "because it would spoil the story she is determined to tell."  (*In the Fraud Archive,* at 32.)

The standards of candor and completeness that apply to journalists *a fortiori* apply to a judge who publishes an opinion in a case where the record is under seal and inaccessible to the public *as a matter of law*. The Contempt Order falls short of these standards.

A fair narrative of the controversy between debtor and the Labatt Judgment Creditors would have covered in some detail the following topics:

1.  The Labatt Judgment Creditors' 30-year record of violating the food purity laws.

2.  The demand for a restriction on debtor's right to practice law as a condition of settlement, in violation of R.P.C. 5.(b).

3.  The district court's role in engineering such a restriction.

4.  The Labatt Judgment Creditors' attempt to defraud the Seventh Circuit into permanently sealing the 90c5009 record by alleging, falsely, that debtor had falsely accused them.

The Contempt Order ignored these topics because discussing them "would [have] spoil[ed] the story" the district court was "determined to tell." *In the Fraud Archive*, p. 32.

The Contempt Order is also lacking in candor in other respects. It misstates the procedural history of the order sealing 90c5009, transforming it from a stipulated order into an adjudicated order. *See* §§H-1-2, above. It omits facts relevant to debtor's status as a Grove Fresh attorney post-January 21, 1993. *See* §J-12. It also omits facts relevant to findings that debtor sought to damage the defendants "outside the courtroom" and sought to "beat one of the defendants…'over the head in public with what [he] believe[d] to be wrongdoing.'" (A.47-48, ¶¶14-15; A.211-17, ¶¶31-38, 42-44, 46-48.)

### C.   This court can, and should, enter summary judgment for debtor on the complaint.

As set forth in §A, above, the undisputed facts show that debtor did not cause a willful and malicious injury. Therefore, this court may, and should, enter summary judgment on the complaint in debtor's favor. Wright, Miller & Cooper, FEDERAL PRACTICE & PROCEDURE: 2d §2716 (2009) ("when the Rule 56(c) standard has been met, the reviewing court may direct the entry of summary judgment even though the [lower] court did not act favorably on the motion.")

## II.   THE TRUSTEES BREACHED THEIR FIDUCIARY DUTIES, SO THEIR FEE AWARDS SHOULD BE VACATED.

A bankruptcy trustee has a "duty to both the debtor and the creditors to realize from the estate all that is possible for distribution among the creditors.…" COLLIER ON BANKRUPTCY ¶704.02[3] (2001). The trustees breached this duty in three respects. *First*, they colluded with the Labatt Judgment Creditors to divert the $50,000 Fund from application to the $149,554 fee award and, instead, used that Fund to finance unproductive litigation against debtor and his wife. *Second*, they paid $48,000 in fees to recover contested assets of $20,432—a net loss to the estate of $27,568. (R.88, ¶¶17-20; R.85.)  *Third*, they recognized that debtor's counterclaim was a valuable asset, and that "it would be in the best interest of

creditors of this estate" to sell the counterclaim at "a court-administered auction," (R.88, ¶8), but failed to take any action for seven years before abandoning it.

Because the trustees' breaches diminished the value of the estate, they are not entitled to retain their compensation. *See In the Matter of Taxman Clothing Co.*, 49 F.3d 310 (7th Cir. 1995) ("Fees obtained as a consequence of a breach of fiduciary obligation, even a nonwillful breach… may be retained only if…the fiduciary, notwithstanding his breach, conferred a benefit on his principal"). Accordingly, the fee awards to the trustees should be vacated.

### III. THE BANKRUPTCY CASE SHOULD BE REMANDED FOR A HEARING ON THE MERITS OF DEBTOR'S OBJECTIONS TO THE TRUSTEE'S APPLICATIONS FOR ADMINISTRATIVE EXPENSES.

Debtor objected to the trustee's applications for administrative expenses, but the bankruptcy court declined to hear the objections, ruling that debtor lacked standing because the chapter 7 estate was insolvent. (R.88, ¶25.) The rule cited by the bankruptcy court is the correct *general* rule, but an *exception* exists where, as here, a debt has been ruled non-dischargeable. In such a case, debtor has standing to challenge administrative expenses because "any portion of the estate not used to pay administrative expenses could be used by the [debtor] to pay a creditor who attempts to recover from [him] personally at the close of bankruptcy." McGuirl v. White, 86 F.3d 1232 (D.C. 1996).

Accordingly, the bankruptcy case should be remanded for a hearing on the merits of debtor's objections to the trustees' applications for administrative expenses.

## CONCLUSION

For the reasons stated above this court should: (a) reverse summary judgment for the Labatt Judgment Creditors in 99-A-1573 and enter summary judgment on the complaint for debtor; (b) remand 99-A-1573 for an adjudication of debtor's counterclaim; (c) vacate the fee awards to the trustees; and (d) remand the bankruptcy case for a hearing on the merits of debtor's objections to the fee awards to the trustees' attorneys.

Dated: May 27, 2009                                    /s/ John P. Messina

John P. Messina, Debtor
541 N. Cuyler, Oak Park, IL 60302
(708) 228-4507
Attorney No. 1892622

50